REPLOGLE et al. v. INDIAN TERRITORY ILLUMINATING OIL CO.

No. 30300. Dec. 14, 1943.

*143 P. 2d 1002.*

Leverett Edwards, of Oklahoma City, for plaintiffs in error.

A. M. Ebright, W. P. McGinnis, C. E. Bailey, and Lois Straight, all of Bartlesville, for defendant in error.

DAVISON, J. This is an action instituted in the district court of Oklahoma county on December 18, 1936, by D. Replogle and William G. Johnston, as partial owners of the lessors' interest in an oil and gas lease, to recover a money judgment in the principal sum of $2,-518.52 plus interest accrued and accruing, against the Indian Territory Illuminating Oil Company, as operating co-lessee, for gas produced from an oil and gas well on the leased premises in the Oklahoma City field and used by the defendant company in its fuel lines.

After issues had been joined by appropriate pleadings, the cause was tried to the court without the aid of a jury and resulted in a judgment for the defendant company which the plaintiffs as plaintiffs in error herein seek to reverse on appeal.

The gas for which recovery was sought was produced by the defendant company from an oil and gas well known as the No. 1 well on the Bertha Johnson lease between and including November, 1929, and October, 1930. With the exception of a small partial payment made in 1936 and a previous payment made by the Oklahoma Natural Gas Company for a relatively small amount of gas bought by it, the gas produced and used has not been paid for.

The lease under which the defendant company was operating had been executed in 1926 and contained the following provision:

". . . The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline, or any other product, as royalty, one-eighth of the market value of such gas. If said gas is sold by the lessee,

then as royalty one-eighth of the proceeds of the sale thereof."

The company does not deny that so long as the foregoing provision of the lease remained in effect it was required to pay by distribution among the owners of the lessors' interest for one-eighth of the value of the gas so produced and used. However, it takes the position that in this particular the lease had been modified by the subsequent execution by the plaintiffs of a contract (called a stipulation) whereby plaintiffs released them from liability for the production of gas under the circumstances accompanying the production of the gas involved in this action.

The stipulation about which this controversy revolves was executed under date of November 25, 1929. The essential part reads as follows:

"Whereas, the Undersigned are owners of lessor's interest in and under the following described land situated in Oklahoma County, Oklahoma, towit:

"The Northwest Quarter (NW¼) of Section Twenty-five (25), Township Eleven (11) North, Range Three (3) West,

subject to a certain oil and gas mining lease thereon dated December 1, 1926, which lease is now owned by the Wirt Franklin Petroleum Corporation, Indian Territory Illuminating Oil Company and Foster Petroleum Corporation, and

"Whereas, by reason of the large volume of gas encountered in the drilling of Well No. 1 on said land, oil cannot be produced from said well without the production of large quantities of gas in connection therewith, and

"Whereas, the Corporation Commission of the State of Oklahoma has made protest against the production or release of said gas unless the same can be utilized and not wasted, and

"Whereas, no market for said gas exists at the present time and the only use to which the same can be put is to connect said well to the fuel lines of said lessees used in their drilling operations in the Oklahoma City District which lines are now supplied by gas from other sources, and

"Whereas, it is the desire of the undersigned that said lessees connect said well to its fuel lines for the purpose of utilizing said gas so as to allow the production of oil in larger quantities from said well.

"Now, Therefore for and in consideration of said desire on the part of the undersigned, and the sum of One Dollar ($1.00) receipt of which is hereby acknowledged, the undersigned hereby stipulate and agree that the said Wirt Franklin Petroleum Corporation, Indian Territory Illuminating Oil Company and Foster Petroleum Corporation, lessees under said lease, may connect said well to their respective fuel lines and use said gas from said well in connection with their operations in the Oklahoma City District, free of cost to said lessees, until such time as said well can be operated and oil produced therefrom under the rules and regulations of the Corporation Commission of the State of Oklahoma, without utilizing said gas, or until such time as there is a market for said gas, provided further that if at any time the supply of Tail Gas from gasoline plants of said lessees or the other sources of gas supply which are or may be available to said lessees for use in their said operations in the Oklahoma City District without cost to them, should fail and it becomes necessary for said lessees to purchase gas for their said operations in said district, then and in that event said respective lessees shall pay royalty to the owners of lessor's interest under the terms of said lease, for the gas so used by them from said well during the time said lessees would otherwise be compelled to purchase gas."

Plaintiffs' interest on production was 1.171875 of the gross.

The "stipulation" was signed by the plaintiffs herein and other owners of the lessors' interest on the premises (with the exception of the owner of one small fractional interest, a man by the name of Wright who was not located). This man Wright was later located and paid for the gas produced and used in accord with the provisions of the lease. For some unexplained reason the defendant company in 1936 made a small payment to the plaintiffs for gas used

during July, August, and October of 1930.

In presenting the cause on appeal plantiffs urge in substance that the judgment of the trial court was not justified by the proof. The gist of their contention is that the stipulation was proven to have been procured by fraud and was therefore ineffective to release the defendant company from liability to pay for the gas produced, and in the alternative that if the procurement of the "stipulation" was free from fraud, then by the terms of the "stipulation" as properly interpreted and construed the company was not entitled to avoid payment for the gas produced and used.

In order to understand the contentions of the respective parties, consideration must be given to the situation that existed when the stipulation was executed.

The policy has developed in this state to prevent waste in connection with the production of oil and gas, and for that purpose regulatory powers have been conferred upon the Corporation Commission. Russell v. Walker, 160 Okla. 145, 15 P. 2d 114; Sterling Refining Co. v. Walker, 165 Okla. 45, 25 P. 2d 312; Wilcox Oil & Gas Co. v. State, 162 Okla. 89, 19 P. 2d 347.

The Oklahoma City field was discovered a relatively short time before the period involved in this litigation (December, 1928), and during the time the gas herein involved was being used, development was rapidly progressing. The rate of development was such that during the period between 75 and 100 wells were in the process of being drilled at all times. As soon as one was completed another would be started.

Production in this field was accomplished from deep horizons and was accompanied by tremendous gas pressure, rendering it impossible in most instances to produce oil without also producing an enormous quantity of gas. This condition created a surplus of gas, especially "wet gas." This latter type of gas had to be treated before it could be feasibly used for domestic or commercial pur-

poses and was not readily marketable, even under normal conditions. The principal and only major purchaser of gas for such purposes in the field was the Oklahoma Natural Gas Company, a public utility company supplying Oklahoma City and other municipalities throughout the state, which company had available other sources of supply outside the field. Some use was found for portions of the gas in connection with production in the field.

The Corporation Commission in the performance of its regulatory administrative duties was at that time endeavoring to prevent the waste of gas. It was insisting, among other general policies, that the production of oil be curbed to an extent that the waste of gas would be avoided or minimized.

The Bertha Johnson well was completed on July 25, 1929. It had a very high gas-oil ratio. The gas was wet gas. Production of oil could not be accomplished without the production of the gas. The Corporation Commission was threatening to curb or prevent production of oil from the well unless the gas could be utilized.

The operating lessee, defendant company herein, had a number of producing wells which like the Bertha Johnson produced large quantities of gas in connection with the production of oil. Gas from the other wells was being turned into a "fuel line" belonging to the defendant company and used in conjunction with its development and production activities. It had an ample supply of gas without using gas from the Bertha Johnson. In most instances the other wells from which gas was being used were situated on property where the defendant company owned the 7/8 working interest in the lease and was thus compelled to account for only 1/8 of the gas utilized by it. In this respect the situation was definitely different with respect to the Bertha Johnson, where the company was only an operating colessee.

When the Corporation Commission turned its attention to the Bertha Johnson and began to threaten to shut down

the well unless the waste of gas be stopped, the company decided to use the gas in the fuel lines if it could procure from the royalty owners an agreement which would release it from its obligation to pay the royalty owners for the gas thus utilized. This contemplated arrangement would prevent a shut-down or disproportionate curbing of production from the well.

The advantage of such an arrangement to the royalty owners was obvious. It would enable production of oil from the well to continue at a normal rate. The production of oil was large and profitable. Therein lies the consideration for the release of liability to pay for the gas under the lease (if such release of liability was accomplished by the stipulation).

In this jurisdiction consideration is defined by statute as benefit conferred or agred to be conferred upon the promise or prejudice suffered or agreed to be suffered by the promisee other than that which he is otherwise lawfully bound to suffer. 15 O. S. 1941 § 106.

There is little question that the defendant company as operating lessee of the Bertha Johnson well, when confronted with an order of the Corporation Commission calculated to prevent the waste of gas from that well, was under a legal duty by virtue of its lease contract to endeavor to find a market for the gas in order to continue the production of oil, but it is doubtful that it could have been compelled to create a market where none existed or to turn such gas into its fuel lines, which were already adequately supplied. Thus by providing a means of utilizing the gas under circumstances where such means was not otherwise available it suffered a prejudice by undertaking a burden which it was not otherwise obligated to assume. The arrangement likewise conferred a benefit on the lessor by making possible a continuation of the production of oil which operated to the benefit of lessors. The stipulation was thus supported by consideration.

There is some indication in the record

that the well was connected to the fuel line before the stipulation was executed; however, in point of time the acts were closely related and were carried out as a part of a general plan to enable production to continue.

There seems to be little question that, but for the attitude of the Corporation Commission, the gas would have been wasted, and plaintiffs do not urge that they could insist upon payment for such wasted gas. Thus, in this instance, the utilization of the gas was purely a means of accomplishing the production of oil for the mutual benefit of lessors and lessees. The lessors, though getting nothing other than the continued production of oil, received just as much as they would have received if production of oil accompanied by waste of gas had continued.

But to return to the stipulation. It was presented to the plaintiffs by an agent of the company and they signed the same. The contents of the stipulation are already set forth. With reference to the procurement thereof we quote from the testimony of the plaintiff Replogle, relating to his dealings with the representative of the defendant company:

"Q. All right, now, he didn't misrepresent the size of the well, either the oil or gas, he didn't misrepresent to you the notice and citation from the Corporation Commission, that is correct, isn't it? A. Yes, sir, that is correct. Q. Now, what did he say to you that was a misrepresentation? A. Well, he might have been telling the truth at the time as far as he is concerned. It is what the company did afterwards that is wrong."

The plaintiff Johnston testified:

"Q. Now, Mr. Johnston, no one of the defendant company talked to you about the execution of this stipulation before you signed it, did they? A. I don't recall it, no, sir. I don't recall anyone. except Mr. Harries talking to me and Mr. Replogle probably talked to me."

Mr. Harries was the office manager for the plaintiffs, Replogle and Johnston. At the time he had no connection with the defendant company. He appeared

as a witness for the plaintiffs in this case. He testified in part:

"A. Well, to the best of my recollection, this man came there with this document and stated that he wanted the signatures of Mr. Replogle and Mr. Johnston to that document, and to the best of my recollection, that the Corporation Commission had made a demand that they utilize the gas that was being popped off in the air from the Bertha Johnson well. Q. What else, if anything, did he say with respect to the gas at the Bertha Johnson No. 1? A. Well, I just really don't know."

And at a later point:

"A. Well, Mr. Hodges, it seems to me that he made two or three trips up there, and I believe that he had been to the office on matters for other acreage in which my employers were interested, and he appeared to be quite concerned about having this stipulation signed, and I believe that we discussed it generally."

To establish fraud it must be shown that material, false representations of fact were made with knowledge of their falsity or in reckless disregard of their possible falsity with the intention of causing another person to act thereon, and that such other person did act thereon to his detriment. Miller v. Troy Laundry Machinery Co., 178 Okla. 313, 62 P. 2d 975.

The trial court determined by its judgment that there was no fraud in the procurement of the contract. Its decision on the point is amply sustained by the evidence.

Since the stipulation was supported by consideration and free from fraud in the procurement, the parties are bound by the same.

Our next problem is to determine whether under the terms of the stipulation any liability to pay for the gas existed.

Several situations were outlined in the stipulation under which the lessors might expect payment for any gas utilized.

The first was when and if production from the well could be accomplished under the rules of the Corporation Commission without utilizing the gas. It is not contended that that situation ever arose.

The second was when a market should become available for said gas, referring, of course, to gas from the well.

We have already discussed the general conditions in the Oklahoma City field at the time and the limited market that was available generally. These liimted demands created no demand for gas from the Bertha Johnson.

One other circumstance previously alluded to requires special mention in connection with this feature of the stipulation. For a short time the Oklahoma Natural Gas Company periodically took gas from the well and paid plaintiffs herein their proportionate share for the gas so taken. Plaintiffs now urge that such use of the gas constituted a market for the same, and that the existence of the market was a contingency upon which the stipulation terminated and ceased to be effective.

Our examination of the testimony on this point discloses that the attempted use of the gas by the public utility was more in the nature of an unsuccessful attempt to find a market for gas from the well than the accomplished discovery of a market.

Mr. E. I. McAninch, an employee of the Oklahoma Natural Gas Company, who at the time had charge of the field end of gas measurements in the Oklahoma City field, explained the transaction. We quote from his testimony:

"A. We tried to buy gas from that well and did for a short period of time, but the condition of the gas, after it came through the separator on the well, was such it was a liability to us instead of an asset, and we were forced upon three different occasions to shut the well out, and then again we would try to take gas from it, but finally conditions got so bad we just had to take our connections away. . . . . Q. Now, you said it was a liability instead of an asset. Just ex-

plain to the court what you meant by that expresison. A. Coming into our lines with the gas was an oil and water sediment which would get in the lines and be .carried along down our transmission system and the water would oftentimes freeze it and it would cause us a great deal of trouble because of the lines that were frozen up out in the field, which happened several times during that winter."

Market in the sense used in the stipulation alludes to the opportunity for selling the commodity (gas) from the Bertha Johnson well, that is, the existence of a commercial demand for the same. (Webster's New International Dictionary, 2nd Ed., pg. 1504).

The trial court determined that there was no market for the gas from the well during the time involved, and that the interval of use by the public service company did not constitute a market or indicate the existence of one.

Our search of the record reveals nothing which would justify the holding that the trial court's finding on this phase of the controversy was unsupported by the evidence.

The next contingency contemplated by the contract is more troublesome. It is in the conjunctive and contemplates two named concurring conditions. For clarity, we requote in part the supplemental contract or stipulation:

". . . provided . . . that if at any time the supply of Tail gas from gasoline plants of said lessees or the other sources of gas supply which are or may be available to said lessees for use in their said operations in the Oklahoma City District without cost to them, should fail *and* it becomes necessary for said lessees to purchase gas for their said operations in said district, then and in that event said respective lessees shall pay royalty to the owners of lessor's interest under the terms of said lease, for the gas so used by them from said well during the time said lessees would otherwise be compelled to purchase gas." (Emphasis ours.)

In view of the situation as it existed, this particular phase of the contract is uncertain and perhaps somewhat ambiguous.

The company did not, at the time the contract was drawn, have an entirely free source of gas from its other wells. It was paying lessors, under other leases, their ⅛ royalty. But the nonexistence of a free source of gas was not all that was required in order that payment be made to plaintiffs for gas used from the Bertha Johnson. It was also necessary according to the terms of the contract that it should also become necessary for the company (lessees) to purchase gas. This second conjunctive requirement did not occur. It did not become necessary for the company to purchase gas for its fuel lines during the period involved unless we consider the payment of royalty to lessors under other wells to constitute a purchase. In view of the circumstances of this case, it is doubtful if the word was so used in the stipulation (if it could be accurately so used). The parties obviously intended that when and if the then existing source of supply from other wells became inadequate and it became necessary to supply the fuel lines in whole or in part by the purchase of gas from other sources, payment to plaintiffs and other owners of lessors' interests under the Bertha Johnson well would be resumed.

In this state, oil and gas in its natural state is regarded as not susceptible of ownership in place apart from the land; but when it is produced and reduced to possession it is personal property. Kolachny v. Galbreath, 26 Okla. 772, 110 P. 902; Rich v. Doneghey, 71 Okla. 204, 177 P. 86; American Surety Co. of New York v. Marsh, 146 Okla. 261, 293 P. 1041. When the land is owned by one and production accomplished by another under a lease, the question of whose personal property gas or oil is upon being reduced to possession depends largely upon the wording of the lease.

Reference to the provision of the lease, supra, under which gas was being produced and used from old-producing horizons makes it doubtful that title to any portion of the gas so produced and

used was in the lessor after production. There is no indication in the record that gas from other wells used in the fuel line was produced under contracts which would give title to the lessor.

If the lessors had no title, the transaction whereby the lessees paid for the gas could not properly be called a purchase, for the use of the word "purchase" connotes the transfer of ownership from a seller to a buyer. Thus the holding of the trial court that no situation arose whereby the defendant company was compelled to purchase gas within the meaning of that term as it was obviously used in the contract is supported by the language used in the contract viewed in the light of the circumstances surrounding the transactions.

The plaintiffs point out that the contract was drawn by the defendant company and invoke the rule for interpreting contracts against the person responsible for ambiguity where the same exists in the written instrument. They urge that upon consideration of that rule the contract should be interpreted to mean that if the company paid royalty owners under other wells, payment should be made to them.

The rule invoked is subservient to the rule which requires reference to attending circumstances to determine the meaning and purpose of the language used by the contracting parties. The rule requiring interpretation against the party who prepared the contract is set forth in 15 O. S. 1941 § 170, which reads:

"In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, except in a contract between a public officer or body, as such, and a private party, in which it is presumed that all uncertainty was caused by the private party."

One of the "preceding rules" alluded to is section 163, Id., which reads:

"A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

Reference to the circumstances surrounding this transaction justifies the conclusion announced by the trial court that payment to plaintiffs was not contemplated merely because defendant was paying other lessors for gas used from other wells operated by the company.

There is some question raised in the briefs as to whether this is an action of legal or equitable cognizance, this for the purpose of determining which rule should obtain with respect to the consideration of evidence on appeal. Our review of the record convinces us that the judgment of the trial court is not only supported by evidence (the requirement in cases of legal cognizance), but that it is not contrary to the clear weight of the evidence (the test in equitable actions). Our conclusion in this respect dispenses with the necessity of classifying the action.

The decision of the trial court is free from prejudicial error and is affirmed.

CORN, C.J., GIBSON, V.C.J., and RILEY, OSBORN, BAYLESS, WELCH, HURST, and ARNOLD, JJ., concur.