**CONTINENTAL SUPPLY CO. v.
MARSHALL et al.**

No. 3057.

Circuit Court of Appeals, Tenth Circuit.

Nov. 29, 1945.

Rehearing Denied Jan. 23, 1946.

Roy C. Lytle, of Oklahoma, City, Okl. (D. I. Johnston, of Oklahoma City, Okl., on the brief), for appellant.

Mark Goode, of Shawnee, Okl. (John L. Goode, of Shawnee, Okl., on the brief), for appellee Federal National Bank.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This appeal primarily involves the relative rights of two mortgagees under their respective mortgages upon the mortgagor's undivided interest in certain oil and gas leases. The facts and judgment of the trial court are stated in its reported decision (D.C., 52 F.Supp. 717), but a restatement here is deemed essential to a proper understanding of the questions for review.

On July 23, 1941, the appellee, H. G. Marshall, as owner of an undivided 8/32nds of the 7/8ths working interest in two oil and gas leases (sufficiently described as the Pensoneau and Whitehead leases, located in Pottawatomie County, Oklahoma), executed and delivered to the appellee, The Federal National Bank of Shawnee, Oklahoma, two mortgages, identical in form, on these leases. Each of the mortgages was given to secure a note of even date in the sum of $20,000, and to secure all other indebtedness and liabilities of the mortgagor to the mortgagee then or thereafter existing, and however incurred, not to exceed $20,000, and also to secure all amounts which the mortgagee might become liable or obligated to pay on behalf of the mortgagor, whether by agreement or by operation of law, in order to protect its security. The note secured by the mortgage on the Pensoneau Lease was executed by Marshall as principal, and the note secured by the mortgage on the Whitehead Lease was endorsed by him for the Ideal Drilling Company, a wholly owned corporation.

Each of the mortgages covered the mortgagor's undivided interest in the respective leasehold estates and the "lease equipment" thereon. In addition thereto, the mortgages specifically covered and included all rents and proceeds derived from the leases, and the mortgagor agreed to execute all necessary assignments and division orders requisite to vest title to the same in the mortgagee during the life of the mortgages. Both instruments were recorded in Pottawatomie County as real estate mortgages, and were also filed as chattel mortgages, on the date of their execution. Contemporaneously and in accordance with the terms of the mortgages, the mortgagor executed division orders to the purchaser of the oil and gas from the leases, directing it to pay the proceeds of the oil and gas produced from his interest in the leasehold estates to the "Federal National Bank for H. G. Marshall", and from and after July 30, 1941 until November 30, 1942, the proceeds

from the oil produced and sold were paid to the Bank in accordance with the division orders, and by it deposited to the checking account of Marshall, who paid the proportionate share of the operating costs to the operating partner on each of the leasehold estates.

On the following March 11, 1942, Marshall entered into a written agreement with appellant, Continental Supply Company, in which it was agreed that in consideration of Continental dismissing without prejudice certain litigation then pending against Marshall, and releasing certain securities held by it, Marshall would execute to the Continental his note dated January 2, 1942 in the sum of $47,137.31, due April 2, 1943. To secure the payment of this note, Marshall agreed to execute a real estate mortgage covering all of his 8/32nds interest in the Whitehead Lease, and one-half of his 8/32nds interest in the Pensoneau Lease, said mortgage to be subject to the two prior mortgages in favor of the Bank, covering all of Marshall's 8/32nds interest in each of these leases. The mortgage was also to include Marshall's 8/32nds interest in the Pecore Lease, also located in Pottawatomie County, but not included in the Bank's mortgages. Marshall represented that his total indebtedness to the Bank, secured by the Bank's prior mortgages, would not exceed $35,000, including interest; that he would not borrow additional funds from the Bank to be secured by its mortgages; that he would secure a letter from the Bank stating the exact balance due it with interest as of March 1, 1942, and agreeing that it would not lend Marshall additional sums to be secured by its present mortgages. He agreed to execute to Continental proper transfer orders covering its mortgaged interest in the oil and gas produced and sold, subject only to the prior mortgage indebtedness in favor of the Bank, and for which, as we have seen, transfer orders to the Bank had already been executed and delivered. When the prior indebtedness to the Bank had been discharged, Continental was to receive all of the runs from the interest covered by its mortgage, remitting to Marshall the operating expenses attributable to the Whitehead and Pecore leases. However, Marshall agreed to pay all of the operating expenses charged to his 8/32nds interest in the Pensoneau Lease (which produced substantially all of the income involved here), so that Continental's 4/32nds mortgaged interest would be equivalent to an overriding royalty, unburdened by any operating expenses. The contract also contemplated that Marshall might sell parts of his interest in the Pensoneau Lease, and Continental agreed to release its mortgage on any interest sold prior to May 16, 1942, provided the proceeds of such sale would be applied on the mortgage indebtedness to the Bank, or to its mortgage if the Bank had been paid.

Pursuant to this agreement, the note and mortgage were drafted, but when Marshall failed to procure the letter from the Bank stating the amount of his indebtedness as of March 1, 1942, and agreeing not to lend him any additional sums to be secured by the property included in its mortgages, this provision of the contract was stricken and the note and mortgage were finally executed by Marshall and duly acknowledged on March 26, 1942, effective as of January 2, 1942.

In a telephone conversation on the following March 31st, Continental informed the Bank of its mortgage, and of Marshall's agreement to obtain a letter from the Bank stating the amount of his indebtedness to it as of March 1, 1942, and agreeing that it would not increase its mortgage indebtedness to Marshall. Its President refused to commit the Bank concerning the statement or the agreement, and in a telephone conversation the following day (April 1st), the attorney for Continental again informed the Bank of Continental's second mortgage; again asked the Bank to render a statement of Marshall's indebtedness, and to agree not to make further advances under its mortgages. The Bank suggested that Continental send a letter containing the statement and proposed agreement for consideration, and on the same date, Continental mailed the letter to the Bank. Continental, apparently not having heard from the Bank, by letter of April 7, 1942, again informed the Bank of its agreement and second mortgage on the part of Marshall's leasehold estate, and asked for a balance of Marshall's indebtedness to the Bank. It informed the Bank that in accordance with its second mortgage, it would be required to contest "the priority of any additional funds which you might advance to Mr. Marshall." Acknowledging Continental's letter on April 9th, the Bank stated that if Marshall had given Continental a second mortgage on his interest in the oil and gas leases, and if Con-

tinental demanded that the Bank not make any further loans under its mortgages, it would have to "abide by your demands in this matter," but that such action would practically shut off Marshall's credit there, and further stated that it did not "feel at liberty" to inform Continental of Marshall's indebtedness without his consent.

On April 14, 1942, the mortgage, which had been previously executed and delivered to Continental on March 26, 1942, as altered in some immaterial respects by mutual agreement, was re-executed and duly recorded as a real estate mortgage on April 18, 1942 in Pottawatomie County. Two days after the re-execution of the mortgage and on April 16, 1942, with Marshall's permission, the Bank informed Continental by letter that Marshall's total indebtedness to it, both as endorser and otherwise, as of the close of business March 15, 1942, was $25,075.86, secured by mortgages on the Pensoneau and Whitehead leases.

Subsequent to the execution of the agreement between Marshall and Continental, but before the final execution and recordation of its mortgage, Marshall sold an undivided 1/32nds overriding interest in the Pensoneau Lease for $17,500. Both Continental and the Bank released this interest, and thereafter the Bank's mortgage covered an undivided 7/32nds interest in this lease, while Continental's mortgage, when finally executed and recorded, covered 3/32nds undivided interest in the same lease. In accordance with the Bank's mortgage and the division orders executed by Marshall pursuant thereto, the Bank continued to receive the checks for the oil runs from the 7/32nds interest in the Pensoneau Lease, and 8/32nds interest in the Whitehead Lease, and to deposit the same in Marshall's checking account. On September 1, 1942, Marshall sold an additional 2/32nds undivided interest in the Pensoneau Lease for a net sum of $24,000. The Bank released its mortgage on this interest, but Continental refused, and its mortgage on 3/32nds interest remained intact, so that effective September 1, 1942, Marshall owned, and the Bank's mortgage covered, 5/32nds undivided interest in the Pensoneau Lease, and Continental's mortgage continued to cover an undivided 3/32nds interest in the same lease. From September 1 to November 30, 1942, the Bank continued to receive the proceeds from the 5/32nds interest in the Pensoneau

Lease, and to deposit the same to the checking account of Marshall, and all payments on Marshall's indebtedness to the Bank were made by check on his account.

When Marshall failed to apply all of the proceeds of the mortgaged property to the satisfaction of his indebtedness to the Bank as it accrued, Continental filed this suit on October 10, 1942 against Marshall and the Bank to foreclose its mortgage. It alleged that Marshall had breached his agreement by failing to deliver transfer orders or copies of operating expenses by months, or to pay any interest on its note for which the mortgage was security, and by borrowing additional funds from the Bank after the execution of the agreement and mortgage. It further alleged that the oil runs from the leases since the execution of its mortgage were greater than Marshall's indebtedness to the Bank when its mortgage was executed with the Bank's knowledge, and that Marshall, with the Bank's consent, had sold overriding interests in the leasehold estate on which the Bank held a mortgage, the proceeds of which had not been applied to the satisfaction of the Bank's mortgages, to the prejudice of Continental's mortgage. It prayed for a judgment against Marshall for the amount of the note with interest and attorney fees, for foreclosure of the mortgage security, and the appointment of a receiver for the property. It also prayed for a judgment against the Bank for the difference between the net income from the mortgaged properties and the amount of Marshall's indebtedness to the Bank as of March 15, 1942, represented by the Bank to be $25,075.86, with interest thereon, said judgment to be credited on Continental's judgment against Marshall.

Marshall's answer is not material here, but in its answer, the Bank alleged that while Marshall had applied part of the proceeds of his mortgaged properties to his indebtedness at the Bank, he was yet indebted to it under his notes and mortgages. The Bank pleaded its notes and mortgages, and alleged that every loan made to Marshall was secured by its mortgages on the leasehold estates and the proceeds therefrom. It offered a detailed accounting, according to which Marshall owed the Bank a balance of $2,634.11, for which it prayed judgment against Marshall, and it further prayed that court decree its mortgages to be a prior and paramount

lien for the amount of Marshall's indebtedness to it, plus attorney fees, and for foreclosure.

Pursuant to a hearing on November 30, 1942, the trial court denied the application of Continental for the appointment of a receiver, but ordered the Bank to receive the proceeds of Marshall's interest in the oil leases, pay the operating expenses, and apply the balance to the satisfaction of Marshall's indebtedness to it. Upon a trial of the issues as cast, the court held that when Continental took its mortgage from Marshall on March 26, 1942, it had both actual and constructive notice of the Bank's prior mortgages on the same security, "which notice carried with it all of the provisions of those mortgages * * *"; that on April 1, 1942, the Bank had actual notice of Continental's agreement with Marshall and of its second mortgage on a part of the Bank's collateral under its mortgages, and that such notice charged the Bank with "everything that would be developed by proper inquiry." Treating the Bank's mortgages upon Marshall's undivided interest in the leasehold estates as real estate mortgages under Oklahoma law, and not chattel mortgages within the meaning of Section 75, Title 46 O.S.A., the court held, in accordance with the unquestionable weight of authority, that advances made by the Bank to Marshall under its mortgages, after actual notice of Continental's intervening mortgage, which it was not required to make either under the mortgage contract, or to protect its security, were junior in lien to Continental's second mortgage. See Elmendorff-Anthony Co. v. Dunn, 10 Wash. 2d 29, 116 P.2d 253, 138 A.L.R. 558, Annotation p. 566; Davis v. Carlisle, 8 Cir., 142 F. 106; Pomeroy's Equity Juris., 4th Ed., Vol. 3, Sec. 1199; Tiffany on Real Property, Vol. 5, 3rd Ed., Sec. 1463.

Following this rule as a guiding principle, the court found that on April 1, 1942, Marshall owed the Bank $27,476.91,[1] the mortgage lien for which was prior and superior to that of Continental under its mortgage, but held that any sums received by the Bank from the proceeds of the oil and gas produced from Marshall's mortgaged interest subsequent to April 1, 1942, which were not necessary to the protection of the Bank's security, and were not applied to the satisfaction of Marshall's indebtedness, were tantamount to advances or new loans, the lien for which was inferior to Continental's second mortgage. By the use of this formula, the trial court adjusted the accounts of the Bank and Continental under their respective mortgages based upon the income from the mortgaged properties, and finally concluded that as of December 10, 1943, Marshall was indebted to the Bank in the amount of $3,751.04,[2] and that this sum had been subsequently reduced by payments from outside sources to $1,547.76, for which

---

[1] In its written opinion, the court stated that the indebtedness was $26,200.00 but the parties now agree that the actual indebtedness of Marshall to the Bank on April 1, 1942 was $27,476.91.

[2] Proceeds from runs:

| | |
|---|---|
| April 1, 1942 to Sept. 1, 1942 (7/32nds) | $32,163.67 |
| Sept. 1, 1942 to Oct. 31, 1942 (5/32nds) | 4,502.66 |
| Rec'd under order of Nov. 10, 1942 to Dec. 10, 1943 (5/32nds) | 10,857.54 |
| Total amount paid for oil | $47,523.87 |
| Less March runs paid April 14, 1942 | 6,330.30 |
| Gross production April 1, 1942 to Dec. 10, 1943 | 41,193.57 |

Operating expenses:

| | | |
|---|---|---|
| 7/32nds: Apr. 1 to Sept. 30, 1942 | $2,292.52 | |
| 5/32nds: Sept. 30 to Oct. 31, 1942 | 917.02 | |
| 5/32nds: Nov. 1, 1942 to Dec. 10, 1943 | 3,655.30 | |
| Total operating expenses | | 6,864.84 |
| Total net production | | $34,328.73 |
| Marshall's debt to the Bank April 1, 1942 | | 27,476.91 |
| Liens against property (Material, Mechanics) paid | | 10,602.86 |
| Total prior and superior to plaintiff's lien | | 38,079.77 |
| Total production available to pay same | | 34,328.73 |
| Amount on which Bank's lien was prior on Dec. 10, 1943 | | $ 3,751.04 |

judgment was rendered in favor of the Bank and against Marshall. Judgment was also rendered in favor of Continental against Marshall for the unpaid amount of its indebtedness, but the court specifically held that the Bank's mortgage was prior and superior for the amount of its judgment, and decreed that Continental take nothing against the Bank under its mortgage.

On appeal, Continental concedes that the law of the case as announced by the trial court is "eminently correct," but takes many exceptions to the application of the rule to the facts. The Bank contends that the rule announced and followed by the trial court has no application here because its mortgage is a chattel mortgage within the meaning of Section 75, Title 46 O.S.A., which provides: That a chattel mortgage may secure future advances by a mortgagee at its option for any purpose not to exceed a stipulated amount, and all such advances are secured by the mortgage equally "to the same extent and with the same priority, as the amount originally advanced on the security of such mortgage and such advances may be made and repaid and again made and the amount so stated shall be considered only as the total amount of such advances as may be outstanding at one time."

As far as we can ascertain, this statute or any other of similar language, has not been construed by the Oklahoma courts or any other court, and it is neither necessary nor appropraite for us to do so unless we first hold that the Bank's mortgages on the proceeds of the oil and gas produced from the leasehold were chattel mortgages under Oklahoma law. Obviously, if the Bank's mortgages be classified as real estate mortgages under Oklahoma law, the statute relating to chattel mortgages has no effect, and the rule announced and followed by the trial court applies. Again, the Oklahoma courts have not said whether the type of mortgage now under consideration is a real estate mortgage, a chattel mortgage, or both. It has however spoken many times concerning the nature and legal characteristics of an oil and gas leasehold estate, and for the purposes of this case, we must fashion a rule in consonance with those relevant decisions.

■ Oklahoma courts have variously defined an oil and gas lease as a chattel real, an incorporeal hereditament, and a profit a prendre, which grants only the exclusive right, subject to legislative control, to explore by drilling operations, to reduce to possession, and thus acquire title to the oil and gas which is personalty. Kolachny v. Galbreath, 26 Okl. 772, 110 P. 902, 38 L.R.A.,N.S., 451; Barker v. Campbell-Ratcliff Land Co., 64 Okl. 249, 167 P. 468, L.R.A. 1918A, 487; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 89, 3 A.L.R. 352; Garfield Oil Co. v. Champlin, 78 Okl. 91, 189 P. 514; Wright v. Carter Oil Co., 97 Okl. 46, 223 P. 835; Nicholson Corp. v. Ferguson, 114 Okl. 10, 243 P. 195; Cuff v. Koslosky, 165 Okl. 135, 25 P.2d 290; White v. McVey, 168 Okl. 19, 31 P.2d 850, 94 A.L.R. 656; In re Levy, 185 Okl. 477, 94 P.2d 537; Replogle v. Indian Territory Illuminating Oil Co., 193 Okl. 361, 143 P.2d 1002; Crain v. Pure Oil Co., 8 Cir., 25 F. 2d 824; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194; Francis v. Superior Oil Co., 10 Cir., 102 F.2d 732; Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303. See also Tiffany on Real Property, 3rd Ed., Vol. 2, Sec. 589.

■ As a leasehold estate for a term of years, it is a statutory "chattel real" in Oklahoma (Title 60, Sec. 26, O.S.A.); it is a hybrid estate deriving its legal characteristics from both real and personal property, yet it is actually neither. See Tiffany on Real Property, 3rd Ed., Vol. 1, Sec. 3. It is personalty, Duff v. Keaton, 33 Okl. 92, 124 P. 291, 42 L.R.A.,N.S., 472 and also an interest in land, Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 3 A.L.R. 352; Nicholson Corp. v. Ferguson, supra.

The execution of an oil and gas lease is not a conveyance of real estate within the meaning of Section 417, Title 58 O.S.A. relating to the sale of real estate by an executor or administrator under the direction of the probate court. Kolachny v. Galbreath, supra; Duff v. Keaton, supra; Cabin Valley Mining Co. v. Hall, 53 Okl. 760, 155 P. 570, L.R.A.1916F, 493; Pluto Oil & Gas Co. v. Land, 151 Okl. 117, 2 P.2d 945. Interest of the lessee under an oil and gas lease is not "real estate" on which a judgment creditor has a lien granted by Section 706, Title 12 O.S.A., First National Bank v. Dunlap, 122 Okl. 288, 245 P. 729, 52 A.L.R. 126; it is not real property within the meaning of the statute which requires foreclosure suits be filed in the county where the property is located, Widick v. Phillips Petr. Co., 173 Okl. 325, 49 P.2d 132, 104 A.L.R. 228; it is not subject to ad valorem taxes as real property separate and apart from the fee

title, State v. Shamblin, 185 Okl. 126, 90 P.2d 1053; State v. Kirchner, 185 Okl. 129, 90 P.2d 1055. Cf. Commonwealth v. Elkhorn-Piney Coal Mining Co., 241 Ky. 245, 43 S.W.2d 684. "It * * * conveys no interest whatever in the land itself. * * *" Stanolind Crude Oil Pur. Co. v. Busey, 185 Okl. 200, 90 P.2d 876, 879.

■ Apparently without derogating from the foregoing characteristics, an oil and gas lease have been held to be within the statute of frauds, Woodworth v. Franklin, 85 Okl. 27, 204 P. 452, 27 A.L.R. 590; a conveyance of the same by a corporation is required to be attested by its secretary in accordance with the statute relating to conveyances of "real estate" by a corporation, Bently v. Zelma Oil Co., 76 Okl. 116, 184 P. 131, 141; it is a conveyance within the homestead laws relating to real property, Carter Oil Co. v. Popp, 70 Okl. 232, 174 P. 747; it is a grant of real property within the meaning of Section 25, Title 23 O.S.A., which provides the measure of damages for breach of covenants "in a grant of an estate in real property," Nicholson Corp. v. Ferguson, supra; an exception in a deed of conveyance reserving to the grantor the oil and gas is a reservation of an "interest in land," Rich v. Doneghey, supra [71 Okl. 204, 177 P. 89]; Hudson v. Smith, 171 Okl. 79, 41 P.2d 861; Ewert v. Robinson, 8 Cir., 289 F. 740, 35 A.L.R. 219, and is the proper subject matter of an equitable proceedings to quiet the title thereto, Hudson v. Smith, supra. The pledge of unaccrued royalty as security by the lessor of an oil and gas lease is a pledge of an interest in real estate, McCully v. McCully, 184 Okl. 264, 86 P.2d 786; and a realty mortgage upon the land operates to fix a lien on the oil and gas in place as an incident to the ownership of the land itself, White v. McVey, 168 Okl. 19, 31 P.2d 850, 94 A.L.R. 656. An oil and gas lease or any assignment thereof requires all the formalities of a conveyance of any other interest in real estate, and it must therefore be acknowledged and recorded as an instrument relating to real estate in order to impart notice under Section 15, Title 16 O.S.A., Davis v. Lewis, 187 Okl. 91, 100 P.2d 994; Tupeker v. Deaner, 46 Okl. 328, 148 P. 853. See also Thornton Oil and Gas, Vol. 1, Sec. 36. It follows that a mortgage on an oil and gas lease must likewise be recorded as a real estate mortgage to constitute effective notice under the statute, and must therefore be regarded as a real estate mortgage under Oklahoma law. Cf. Standard Oil Co. v. Idaho Community Oil Co., 98 Mont. 131, 37 P.2d 660; Commercial Bank v. Pritchard, 126 Cal. 600, 59 P. 130; McLeod v. Barnum, 131 Cal. 605, 63 P. 924.

Generally, "A mortgage of wood not standing on the land of the mortgagor is a mortgage of personal property, and a record of it as a mortgage of real estate is ineffectual. Also, a mortgage of trees to be cut from the soil is a mortgage of personalty, and is to be recorded as a chattel mortgage. But growing wood or timber is a portion of the realty, and is embraced in the mortgage of the land." Jones on Mortgages, 8th Ed., Sec. 201. See also Nicholson v. Peoples Nat'l Bank, 119 Okl. 113, 249 P. 336. Oil and gas are minerals, and when severed from the leasehold become personal property, Carpenter v. Shaw, 134 Okl. 29, 272 P. 393, reversed on other grounds, 280 U. S. 363, 50 S.Ct. 121, 74 L.Ed. 478; Keystone Pipe & Supply Co. v. Crabtree, 174 Okl. 562, 50 P.2d 1086; Board of Commissioners v. Bernardin, 10 Cir., 74 F.2d 809; McCrae v. Bradley Oil Co., 148 Kan. 911, 84 P.2d 866, although while in place they are part of the realty. White v. McVey, 168 Okl. 19, 31 P.2d 850, 94 A.L.R. 656; Cuff v. Koslosky, 165 Okl. 135, 25 P.2d 290; McCrae v. Bradley Oil Co., supra. And it has been held elsewhere that an oral agreement to assign and transfer an undivided fractional part of the oil and gas to be produced from a leasehold estate, free from development and operating cost, does not constitute an assignment of a present interest in oil in place, and is not therefore an assignment of an interest in real estate so as to bring it within the statute of frauds. McCrae v. Bradley Oil Co., supra, and cases cited therein. "An agreement may be made to create a lien upon property not yet acquired * * * or not yet in existence * * *," but such lien does not attach until the party agreeing to give it acquires the mortgaged interest. Title 42 O.S.A. § 8. Mitchell v. Guaranty St. Bank of Okmulgee, 68 Okl. 110, 172 P. 47; Union Nat'l Bank of Bartlesville v. Leidecker Tool Co., 72 Okl. 121, 178 P. 690. See also Western Oil & Refining Co. v. Venago Oil Corp., 218 Okl. 733, 24 P.2d 971, 88 A.L.R. 1271.

■ The oil and gas covered by the mortgages here certainly was not acquired, nor was it in existence until produced and converted to the possession of the mort-

gagor, and it was then personal property. It would seem therefore that if the parties intended to mortgage the leasehold estate, the mortgage would be upon an interest in real estate, and hence a real estate mortgage. But if, as they did, the parties also intended to mortgage the oil and gas, if and when produced, the mortgage thereon would be upon personalty not yet acquired nor in existence, and therefore a chattel mortgage to the extent that it covered after acquired personal property. Cf. Equitable Life Ins. Co. v. Brown, 220 Iowa 585, 262 N.W. 124; Bankers Life Co. v. Garlock, 227 Iowa 1335, 291 N.W. 536. But under Section 15, Title 16 O.S.A., "no deed, mortgage * * * or other instrument relating to real estate * * * shall be valid as against third persons unless acknowledged and recorded" as evidencing an interest in real estate, and this court held in Stone v. Wright, 10 Cir., 75 F.2d 457, that an assignment of a specified sum, payable out of the proceeds of oil to be produced under a leasehold estate, though not a conveyance of an interest in real estate, was nevertheless so related to and affected real estate as to be a proper instrument for recording under this statute. Following and quoting from our decision in Stone v. Wright, the Oklahoma Court held that assignments of certain sums of money, to be paid from proceeds of oil or gas as, if and when produced from an undivided interest in an oil and gas lease, were "instruments relating to real estate" within the meaning of the recording statutes, supra. Davis v. Lewis, 187 Okl. 91, 100 P.2d 994, 996.

■ If, therefore, under Oklahoma law, the assignment of a specified sum to be paid out of the proceeds of oil and gas to be produced from a fractional interest in an oil and gas lease, is an instrument relating to and affecting real estate, a mortgage upon the same interest is of equal dignity, and must be considered as a real estate mortgage. In view of these pronouncements, we conclude that Section 75, Title 46 O.S.A., does not apply, and the rule announced and followed by the trial court governs the rights of the parties under their respective mortgages. Following this equitable rule, the Bank as senior mortgagee is accountable to Continental as junior mortgagee, for the application of all proceeds derived from the mortgaged security coming into its possession and control, to the satisfaction of its prior mortgage indebtedness, and failure to do so renders its lien junior to that of Continental to the extent of the applicable proceeds which came into its possession and control, and which were not applied to the satisfaction of its mortgage indebtedness.

■■ In our judgment, the trial court correctly fixed April 1, 1942, when the Bank had actual knowledge of Continental's second mortgage, as the crucial date on which the relative rights of the parties should be determined, and the Bank was then and thereafter chargeable with its provisions and legal effect. Admittedly, on that date, Marshall owed the Bank $27,476.91, representing the indebtedness secured by the Bank's prior and superior mortgage. When Marshall failed to apply the proceeds of the sale of the undivided 1/32nds interest sold prior to April 1, 1942 upon his mortgage indebtedness to the Bank, he breached his obligation to Continental, but, since on the date of sale the Bank had no knowledge of Continental's mortgage, and was not a party to the agreement, no liability attached to it by reason of Marshall's breach. The trial court correctly refused to treat the funds thus derived as advances or new loans for which Continental's mortgage would be superior. As the court observed, Continental was advantaged by the application of a part of it to the reduction of the loan prior to April 1st, and it cannot complain. Furthermore, the amount of Marshall's mortgage indebtedness to the Bank on March 15, 1942, or any other date prior to April 1, 1942, is immaterial and has no bearing on the rights of the parties under their respective mortgages, and the court did not err in refusing to hold that the Bank was estopped to assert any other amount on any other date.

■ Marshall's indebtedness to the Bank as of April 1, 1942, in the sum of $27,476.91, included a note in the amount of $5,000.00, dated March 19, 1942, representing a loan of that amount by the Bank, for which $10,000 escrow money was guaranty. The $5,000 note was subsequently paid from the escrow money, but was not credited against the mortgage indebtedness. It is argued that since the $5,000 was a part of the mortgage indebtedness for which the Pensoneau Lease was security, and which was to be paid from the proceeds therefrom, its payment on May 16, 1942 should have been credited to the mortgage indebtedness. In our view, it is unimportant what constituted the mortgage

indebtedness, how acquired, and in what manner. It is sufficient that the mortgage was security for that amount on April 1st. The trial court rightly included the $5,000 as a part of the mortgage indebtedness, but when the note was paid, and the Bank came into possession of the money, it became obligated to either apply the same on the mortgage indebtedness, or have it treated as an advance or new loan, for which its mortgage would be junior to the intervening mortgage of Continental. We conclude that the court erred in failing to apply the $5,000 payment on May 16th to the satisfaction of the prior mortgage indebtedness.

The trial court held that since Continental's mortgage did not cover the 2/32nds interest sold by Marshall on September 1, 1942, for a net sum of $24,000, it could not be called upon to account to Continental for the proceeds of the sale. With this we cannot agree. Under established equitable principles, the junior encumbrancer is entitled to have the proceeds of the sale of mortgaged property applied upon the senior indebtedness, whether the property sold was covered by the junior mortgage or not. And if the senior mortgagee, with actual knowledge of the junior encumbrance voluntarily releases a portion of its security to the prejudice of the junior encumbrancer, without releasing a proportionate part of its debt, it is accountable to the junior encumbrancer for the value of the released security. Turner v. Ridge Heights Land Co., 92 N.J.Eq. 64, 111 A. 675; Anderson v. McCloud-Love Live Stock Comm. Co., 58 Neb. 670, 79 N.W. 613; Boone v. Clark, 129 Ill. 466, 21 N.E. 850, 5 L.R.A. 276; Howard v. Burns, 73 Minn. 356, 76 N.W. 202; 41 C.J., Sec. 539, p. 579; 35 Amer. Juris., Sec. 10, p. 390. The undivided interest in the leasehold estate was as much a part of the mortgaged property as the proceeds of oil and gas produced therefrom, and Continental had as much right to require that the proceeds of the sale of a part of the leasehold estate be applied to the satisfaction of the first mortgage as it did the oil runs coming into its possession and control. If the sale had not been made, the proceeds of the undivided interest would, under the formula of the trial court, have been applied to the satisfaction of the mortgaged indebtedness. We see no valid difference in failure to apply the proceeds of the sale of a part of the leasehold to the satisfaction of the mortgage indebtedness, and the delivery of the mortgaged proceeds from the leasehold estate. Either act of forbearance impairs the security and postpones the day of satisfaction. One is as much within the rationale of the equitable rule as the other—if one constitutes an advance, so doth the other. In either instance, it was optional with the Bank whether the proceeds of the mortgaged property should be applied on the mortgage indebtedness, and failure to do so constitutes an optional advance or new loan, the lien for which was junior to Continental's mortgage.

The appellant also complains of the refusal of the court to treat as advances the March 1942 oil runs from the Bank's mortgaged interest in the sum of $6,330.30, received by it during April 1942. It is contended that since such amount came into the possession and control of the Bank after notice of Continental's mortgage, the court erred in deducting it from total runs received by the Bank since April 1st. The fact that the proceeds accrued prior to April 1st would not make them any the less a new loan, if they were received after April 1st and the Bank failed to apply them to Marshall's indebtedness. The source of the funds is unimportant if the Bank was empowered to apply the same to the satisfaction of its mortgage, and the failure to do so constitutes an optional advance within the meaning of the applicable rule. We are also of the opinion that the trial court should have credited the mortgage indebtedness with the sum of $793.50, representing oil runs received by it from the Whitehead Lease from April 1, 1942, until the date of the trial.

The case is reversed and remanded with directions to proceed in accordance with the views herein expressed.