**Milo M. CRAIG et al., Plaintiffs-Appellees,**

v.

**CHAMPLIN PETROLEUM COMPANY, Defendant-Appellant.**

**No. 410–69.**

United States Court of Appeals, Tenth Circuit.

Jan. 4, 1971.

See also 421 F.2d 236.

George L. Verity, Oklahoma City, Okl. (Montgomery & Curtis, Fairview, Okl., and Murphy & Evans, Kingfisher, Okl., on the brief), for plaintiffs-appellees.

H. Carter Burdette, Fort Worth, Tex. (Cecil E. Munn, Fort Worth, Tex., and T. Murray Robinson, Oklahoma City, Okl., on the brief), for defendant-appellant.

Before BREITENSTEIN and HILL, Circuit Judges, and THEIS, District Judge.

HILL, Circuit Judge.

This suit was brought as a class action by various lessors in the Chaney Dell production area in Oklahoma against their lessee, Champlin Petroleum Company, charging that in the sale of casinghead gas from the various oil wells within this area, the lessee, Cham-

plin, failed to actively seek out a purchaser to pay the market price. The lessors are suing to have the fair market value established as the contract price for the sale of casinghead gas from their leases and to recover for the fair market value not received in past payments. The case was tried to the trial judge who found for the lessors. From that finding, lessee, Champlin, appeals.

The so-called Chaney Dell field which is located some twenty miles west of Enid, Oklahoma, was developed in 1964 and 1965. Champlin Petroleum Company was one of the principal developers in this area. Significant oil production had begun by late 1964, and incident to this oil production was the production of considerable low pressure casinghead gas. This gas is not a commerciable item as it appears at the wellhead. In almost all instances, it must be processed, i. e., liquids must be removed from the gas and it must be pressurized sufficiently to be capable of being introduced into a pipeline. At the time of this development, there were no gas gathering lines or gas processing plants located within the immediate vicinity of Chaney Dell. The casinghead gas, therefore, was flared at the wellhead. In 1965, Champlin entered into a twenty year contract to sell the casinghead gas arising from the production on its leases to the Enid Gasoline Plant at the purchase price of 85% of the weighted average proceeds received by the buyer for the sale at the tailgate of the buyer's plant of the volume of the residue gas attributable to the gas purchased and delivered under the contract.[1] The Enid Gasoline Plant was a joint venture owned by the major producers of the Enid field. Champlin was the owner of·

a 51% interest in the plant and was designated its operator. It was developed in 1963 and processed the casinghead gas arising from the Enid field. In order to handle the casinghead gas purchased from the Chaney Dell area, it was necessary for the Enid Gasoline Plant to extend gathering lines out to the Chaney Dell field to bring the gas back to its processing plant in Enid, Oklahoma.

Located directly south of the Chaney Dell field some six to nine miles was the Ringwood field. This field was developed in the late 1940's and 1950's and has produced and continues to produce large volumes of casinghead gas. This gas is processed through a gasoline plant known as the Ringwood Plant, operated and owned by the Warren Petroleum Corporation[2] and the Oklahoma Natural Gas Company. Pursuant to a purchase contract entered into on December 31, 1960, with Livingston Oil Company, the Ringwood plant purchases casinghead gas for twelve cents per m.c. f. plus 50% of the weighted average net value of all liquid products contained in the raw gas delivered to the buyer.[3]

The complete findings of fact and conclusions of law of the trial judge are set out in Craig v. Champlin Petroleum Company, 300 F.Supp. 119 (W.D.Okl. 1969). Essentially the trial court found that a market for casinghead gas in the Chaney Dell area existed in 1965, and that the market value of such gas was established by the Livingston contract of 1960; that Champlin, by entering into the contract with the Enid Gasoline Plant and failing to actively seek out purchasers for the casinghead gas in the Chaney Dell field, violated its duties as a lessee and therefore the lessors were

---

1. Other producers in the Chaney Dell area entered into similar contracts with Enid Gasoline Plant.

2. Warren Petroleum sold its interest in the processing plant to National Fuels effective January 1, 1963.

3. The contract provided for escalating prices: from January 1, 1961 to December 31, 1965, eleven cents was to be paid

per m. c. f.: from January 1, 1966 to December 31, 1970, twelve cents was to be paid per m. c. f.; from January 1, 1971, to December 31, 1975, thirteen cents was to be paid per m. c. f.; and from January 1, 1976, for the remainder of the term of the contract, fourteen cents was to be paid per m. c. f., in addition to the percentage for the liquids.

entitled to recover the difference between the price they were paid and the price they would have been paid under the Ringwood field purchase contract pricing formula.

The rules concerning appellate review of factual findings are, of course, well established and frequently set out by this court. *See* Davis v. Cities Service Oil Co., 420 F.2d 1278 (10th Cir. 1970). Great weight is given to the trial court's opportunity to determine the credibility of the witnesses, and factual findings will not be disturbed unless "clearly erroneous." Raulie v. United States, 400 F.2d 487 (10th Cir. 1968). The Supreme Court has established the test for clearly erroneous to be: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). *See* Clancy v. First National Bank of Colorado Springs, 408 F. 2d 899 (10th Cir. 1969) and Raulie v. United States, supra. In the present case we are faced with severe problems in sustaining the trial court's finding that there was a market for the Chaney Dell casinghead gas in 1965 available at the 1960 Livingston contract price.

Before a market can be said to exist, there must be an available buyer for the product. The Oklahoma courts have stated this as "opportunity for selling the commodity * * * that is, the existence of a commercial demand for the same." Replogle v. Indian Territory Illuminating Oil Co., 193 Okl. 361, 366, 143 P.2d 1002, 1007 (1943); Greenshields v. Warren Petroleum Corp., 248 F.2d 61 (10th Cir. 1957). In the present case, it is undisputed that there were no existing gathering lines or processing plants within the Chaney Dell field. The closest processor in 1965 was the Ringwood plant. The trial court found Champlin at fault for failing to approach Warren Petroleum Corporation or Oklahoma Natural Gas Company to

see if they would purchase the casinghead gas from the Chaney Dell area. The evidence is undisputed, however, that the Ringwood plant was operating to capacity and that major casinghead gas purchases from the entire Chaney Dell area could not be made. Jack T. Skeith, superintendent of the Gas Purchase and Reserves Department for Oklahoma Natural Gas, and Mr. B. R. Carney, retired manager of the Gas Division for Warren Petroleum Corporation, testified as to the nature of the operations at the Ringwood plant and the availability of the Ringwood market for the Chaney Dell gas.

The Ringwood plant was operating at capacity after new productions of gas were picked up through the 1960 contract. The residue gas from the plant was committed to Cities Service under a contract purchase agreement that set a maximum of forty million cubic feet a day that could be sold and also established a contract area from which the gas was committed to Cities Service. Mr. Skeith testified that he was aware of the Chaney Dell reserves, "but the Ringwood Plant has never been in a position to provide a market for gas in the Chaney Dell area. This is true for two main basic reasons, as stated before, the commitment of this plant to the producers and the commitment of this plant to Cities Service. Without a willingness to modify Certificate of the Federal Power Commission the Ringwood facilities could not be extended beyond the contract area." When asked whether it was a true statement that the Ringwood plant did not constitute an avaliable market or buyer for the Chaney Dell gas in 1965, Mr. Skeith stated: "That's true. We had more gas in the Ringwood field on a daily availability to us than the plant capacity." Mr. Skeith testified that consideration had been given to expanding the plant but it was dropped as uneconomical, also that Cities Service had refused to increase the amount of gas they took under the contract.

Although Champlin's management did not approach Oklahoma Natural Gas or

National Fuels regarding purchase of the Chaney Dell casinghead gas production, evidence established they were fully aware that the Ringwood plant was loaded and could not conceivably take any of the Chaney Dell gas for processing. Therefore, it is clear and virtually undisputed that the Ringwood plant did not offer an available market for the sale of Chaney Dell casinghead gas.

■ The only evidence found in the record to support the trial judge's finding that there was a market available at the Ringwood plant contract price was the testimony of Walker P. Sandlin, a consulting petroleum engineer, with primary experience in gas processing. Mr. Sandlin testified that in his opinion there was a market available as of June 1, 1965. During this period of time, Mr. Sandlin was working as an advisor for the Cooperative Refinery Association of Kansas City. He prepared a study for them and recommended that they approach Champlin with regard to purchasing the Chaney Dell gas. However, the management of the Cooperative Refinery Association decided not to try and purchase the gas and there was no established price recommended at which they might attempt to buy the gas. Nevertheless, Sandlin testified that he felt the market price in the area was established by the Ringwood plant contract. Mr. Sandlin testified that he would have been interested in building a plant and purchasing the gas in 1965, but it is clear that nothing was done to achieve this end. No person could be specifically identified as being available to purchase the casinghead gas produced in the Chaney Dell area. Sandlin's opinion is apparently based on speculation and conjecture[4] and is therefore of diminished value in sustaining the finding that a market existed. *See* Kale v.

Douthitt, 274 F.2d 476 (4th Cir. 1960); Atlantic Life Insurance Co. v. Vaughan, 71 F.2d 394 (6th Cir. 1934); *cf.* United States v. Gravelle, 407 F.2d 964 (10th Cir. 1969).

Some confusion may have resulted in this case from the fact that the potential for a market existed in the Chaney Dell area. Evidence was introduced by plaintiffs to show that sufficient gas reserves were available and that a market existed for the residue gas, *i.e.*, the casinghead gas after processing, making it economically feasible for a purchaser to build a processing plant and buy the casinghead gas in the Chaney Dell area. This is perhaps best illustrated by the fact that two additional processing plants have been built in the Chaney Dell area following Champlin's entering into a contract with Enid Gasoline Plant, these being the Twin Gas plant and the Union Texas Petroleum plant. Both of these plants were established in 1966. Had Champlin been forced to wait until these plants were available to purchase production, however, a considerable amount of casinghead gas would have been flared, and substantial amounts of royalties would have been lost to the lessors. But the fact that the potentiality for a market existed does not mean that a market in fact, as indicated by the availability of a ready buyer, did exist.

It is certainly doubtful that a buyer would have come in at the Ringwood plant contract price. All the testimony contributed at the trial, including that of plaintiffs' expert witness Sandlin, was to the effect that the Ringwood contract price was the highest price ever known in the industry. Several reasons were given by Mr. Skeith and Mr. Carney for this particularly high price. First, the investment costs for the facilities

---

4.  Q. Mr. Sandlin, does your group or any group you are associated with, would they be willing today to purchase the production in Chaney Dell on the basis of a contract which provides for 85% of the residue and 50% of the liquids? A. I think I could get the group that would purchase it for the 12¢ less 50% of the liquids, yes.

\* \* \* \* \*

Q. You would have attempted it? A. Yes, sir, and I believe I could have done it.

had been paid out during a time when the price paid for the gas was extremely low, *i.e.*, prior to the 1960 contract the price was approximately three cents per m.c.f. *See* Greenshields v. Warren Petroleum Corp., 248 F.2d 61 (10th Cir. 1957). This put the operators in a position to be able to offer an attractively high price to insure the full loading of the plant. Secondly, the "straddle" type operation entitled Oklahoma Natural Gas to be classified as a gas line company with respect to the Ringwood operation. This insured a guaranteed rate of return and entitled them to set a contract price with Cities Service for the residue gas in excess of the fifteen cents per m.c.f. allowed by the FPC for regular interstate sales. In particular, they received eighteen and one-half cents per m.c.f. while the Enid Gasoline Plant received fifteen cents per m.c.f. Mr. Sandlin also testified that the intrastate price was fifteen cents per m.c.f. The fact that Cities Service was taking the maximum amount under this contract, however, and the fact that they refused to expand the amount of gas they took under this contract after requested to do so by Oklahoma Natural Gas, indicate that the Ringwood plant contract price represented a peculiar situation and did not establish a normal market price for the immediate area.

The price paid by the other two processing plants in the Chaney Dell area would be perhaps more indicative of the area price. The evidence showed that the Twin Gas plant was purchasing gas under a complicated formula, but that at the present time was paying twelve cents per m.c.f. price. This is particularly significant since they had to directly compete with the Enid Gasoline Plant for casinghead gas. The only evidence concerning the Union Texas plant is that submitted in an exhibit by Champlin which indicated that Union Texas was paying over ten cents per m.c.f. but less than the price Enid Gasoline Plant was paying pursuant to the Chaney Dell contract. The price paid for Chaney Dell gas was the same as the price paid for Enid field gas, and there were numerous other producers than Champlin in the Chaney Dell field who sold their production to the Enid Gasoline Plant at that price, including Oklahoma Natural Gas Company.

The trial court found that Champlin did not exercise due diligence in finding a market for the casinghead gas primarily because they did not actively go out and seek a buyer for the casinghead gas. The record shows that Champlin did discuss the possibility of building a plant with other producers in the Chaney Dell area, but that none of these producers felt a plant to be economically feasible. Other than that, it appears that Champlin did not actively seek out a buyer for the casinghead gas from all those who might be considered as comprising the potential market. There is no indication that Champlin had any knowledge of any party who might have been interested in developing a market. In view of the fact that a purchaser would be required to construct gathering lines and a processing plant in the Chaney Dell area, a substantial investment, it appears to be the practice in the business, as indicated by testimony in the record, for a potential purchaser to approach the producer with a planned project of construction of a processing plant before the gas is purchased. Certainly everyone in the vicinity, including Sandlin and the employees of Oklahoma Natural Gas, were aware of the production of casinghead gas in the Chaney Dell area. Thus while a duty exists on the lessee to find a market for gas produced on the lease, it must exist within the normal procedures and practices of the existing industry.

Although the lessee does not owe a fiduciary duty to the lessor in developing the lease, *see* Townsend v. Creekmore-Rooney Co., 332 P.2d 35 (Okl. 1958); Strange v. Hicks, 78 Okl. 1, 188 P. 347 (1920), still the fact that Champlin by contracting with Enid Gasoline Plant was to a large extent dealing with itself requires us to examine carefully

the fairness of that contract. Champlin introduced evidence showing the return on Enid Gasoline Plant's investment from the Chaney Dell production. This evidence indicated that through 1969, representing a little over four years of operation, there had been a pay-off of little more than half of the investment cost of a million and a half dollars. Champlin projects that this will eventually result in about a $600,000 loss on the project. The trial judge correctly discounted this evidence on the basis that the lessors were entitled to the market price, *i.e.*, the Livingston contract price. Since the finding that a market existed was held to be erroneous, the evidence of return on the contract becomes significant in determining the fairness of the Chaney Dell contract. When this evidence is considered along with the evidence of the other prices paid for gas in the area other than the Livingston contract, it cannot be said that the Chaney Dell contract price was unfair.

In view of all the evidence in the record as discussed above, this court is of the opinion that the trial court's finding that a market existed for the Chaney Dell gas in 1965 at the contract price established in 1960 between the Ringwood processing plant and the producers in that area is clearly erroneous. Champlin's contract with the Enid Gasoline Plant was instrumental in establishing a market in the Chaney Dell area and establishing a future market price for that area. It appears that the contract price was the best price available at the time and it should therefore remain in force. Greenshields v. Warren Petroleum Corp., supra.[5]

The judgment is reversed and the case is remanded with direction to enter judgment for defendant-appellant, Champlin Petroleum Company.

5. This finding makes it unnecessary to examine the effect of the division orders signed by the lessors.