248 F.2d 61
 W. D. GREENSHIELDS, Appellant,
v.
WARREN PETROLEUM CORPORATION, a corporation; et al., Appellees.
Julius LIVINGSTON and Livingston Oil Company, a corporation,
Appellants,
v.
WARREN PETROLEUM CORPORATION, a corporation; et al., Appellees.
 Nos. 5449, 5450.
 United States Court of Appeals Tenth Circuit.
 Sept. 3, 1957.
Rehearing Denied Sept. 27, 1957.
Writ of Certiorari Denied Dec. 16, 1957.
See 78 S.Ct. 334.
 
 W. D. Greenshields, Ponca City, Okl., for appellant, W. D. greenshields.
 Duke Duvall, Oklahoma City, Okl., and Ted R. Fisher, Tulsa, Okl., for appellants, Julius Livingston and Livingston Oil Co.
 Reford Bond, Jr., Chickasha, Okl., and Richard W. Fowler, Oklahoma City, and Warren M. Sparks, Tulsa, Okl., for appellees, Warren Petroleum Corp. and Oklahoma Natural Gas Co. (John S. Carlson, O. L. Lupardus and T. Maxwell Anderson, Tulsa, Okl., were with them on the brief).
 Villard Martin, Garrett Logan and Villard Martin, Jr., Tulsa, Okl., for appellee, The Atlantic Refining Co. Richard W. Fowler, Oklahoma City, Okl., Reford Bond, Jr., Chickasha, Okl., and Lynn J. Bullis, Jr., Oklahoma City, Okl., for appellees, The Superior Oil Co., Mazda Oil Corp., Bolsa Chica Oil Corp. and J. E. Trigg; Reford Bond, Jr. and Hatcher & Bond, Chickasha, Okl., for appellee, Great Western Producers, Inc.
 Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 Appellant Greenshields, plaintiff below, is one of numerous owners of royalty rights in the Ringwood oil and gas field in Major County, Oklahoma. He initiated this action in the State Court of Major County as a purported class action 'for himself and all others similarly situated', naming as defendants all those individuals and corporations holding leases from the royalty owners in the Ringwood Field; also named party defendants were the Warren Petroleum Corporation and Oklahoma Natural Gas Company, referred to as 'plant operators', who, though holding no lease rights in the field, had exclusive contractual rights with the lessee defendants for the purchase of gas produced in this field. Plaintiff had no direct contractual relationship with the plant operators but did with some but not all of the named lessee defendants.
 
 
 2
 Greenshields is a resident of Oklahoma; the lessee defendants are residents of Oklahoma and numerous other states; the plant operators, Warren Petroleum and Oklahoma Natural Gas, are both corporations foreign to Oklahoma. Upon petition of the plant operators and some of the non-resident lessee defendants, including Great Western Drilling Co. and Great Western Producers, Inc., the cause was removed to the United States District Court for the Western District of Oklahoma pursuant to 28 U.S.C.A. 1441(c). That court refused remand and, by subsequent rulings, required plaintiff to amend his pleadings to eliminate all aspects of a class action and to dismiss as against all defendants other than the plant operators and those lessee defendants with whom Greenshields had contractual relations. Included in the latter group are the appellants Livingston and Livingston Oil Company who cross complained against the plant operators adopting the gravamen of plaintiff Greenshields' complaint and cause. The case as actually tried in the United States District Court was substantially an action for breach of contract by Greenshields against his lessees and the plant operators with a cross complaint against the latter upon the part of the lessees Livingston and Livingston Oil. Appellants join in asserting error in allowing removal from the state court and error in the determination of the merits.
 
 
 3
 It is apparent, in considering the jurisdictional question, that general diversity does not here exist and that valid removal from state to federal court is dependent upon the existence of a 'separate and independent claim' which if sued upon alone would be removable. If such exists, apparent from the original pleading, the entire cause is subject to removal. 28 U.S.C.A. 1441(c); American Fire & Cas. Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702; Pullman Co. v. Jenkins, 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334; McLeod v. Cities Service Gas Co., 10 Cir., 233 F.2d 242; Preas v. Phebus, 10 Cir., 195 F.2d 61. It is of no significance that the pleader has a separate claim which he could assert and federal jurisdiction cannot be used as an implement to narrow or restrict the pleader's cause so that finally, when issue is joined, the cause has become one where federal jurisdiction is clear. Removability is dependent upon the course of pleading actually used by the pleader and not by what he could have asserted had he so chosen. Since Sec. 1441(c) was intended to restrict, not enlarge, removal rights all doubts arising from defective, ambiguous and inartful pleadings should be resolved in favor of the retention of state court jurisdiction. Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248; Aetna Ins. Co. v. Chicago, Rock Island & Pacific R. Co., 10 Cir., 229 F.2d 584. It is for the state court to determine the validity and essence of the complaint made if the pleader has asserted and claims but a single cause of action. Alabama Great Southern Ry. Co. v. Thompson, 200 U.S. 206, 26 S.Ct. 161, 50 L.Ed. 441.
 
 
 4
 Applying these rules to the original complaint[1] filed in the state court we are in accord with appellant's contention that the pleader has alleged claims in tort arising from civil conspiracy said to have been consummated by the lessee defendants and the plant operators. But we are of the further view that the pleader has specifically negatived the participation of the Great Western Drilling Company and Great Western Producers, Inc. in the alleged conspiracy in the manner and time the pleader asserts it was conceived and consummated between the remaining lessee defendants and plant operators.
 
 
 5
 In the first paragraph of paragraph 9 of the complaint the pleader has narrated the results of the so-called conspiracy and concludes by stating, 'All because of the unconscionable, confiscatory and unreasonable 'Gas Purchase Contracts' entered by the 'defendant lessees' and 'Plant Operators' all as will be hereinafter more particularly set out.' Then in paragraph 11 it is alleged 'That in late 1950 or early 1951 Warren Petroleum Corporation and Oklahoma Natural Gas Company, corporations, defendants herein entered 'Gas Purchase Contracts' with all the different 'lessee defendants' in the Ringwood Field, with the exception of two who will be hereinafter mentioned.' Later in paragraph 11 the pleader alleges that the 'Gas Purchase Contracts' were executed and entered by all the 'lessee Defendants' except by the defendants Great Western Producers, Inc. and Great Western Drilling Company, a corporation, who have since entered the contract, however, with certain modifications as to producing zones committed under the same. That with this one exception all the lessees entered exact contracts and thus committed the sale of all their gas in the Ringwood Field. Still later in paragraph 17 it is alleged 'That the 'Gas Purchase Contracts' as have been entered by the defendant lessees are unconscionable, confiscatory, unreasonable and are an attempt to alienate valuable property rights from this plaintiff * * * That the contract was a connivance, collusion, and confederation between the plant operators, Warren Petroleum Corporation and Oklahoma Natural Gas Company and all the 'lessee defendants' who signed the agreement * * *'.
 
 
 6
 Since the acts of the Great Western interests are alleged to have transpired at a different time than those of the other lessee defendants and are further asserted to have consummated in a different result, the pleader has negatived the participation of Great Western in the principal conspiracy of which he complains. The contracts signed by Great Western cover a less extensive gas zone than those executed by any of the other defendants. The harm alleged to have been suffered by plaintiff and 'all others similarly situated' by the execution of the gas purchase contracts cannot, by the original state court pleading, be attributable to Great Western. The claim made against Great Western by plaintiff arises from subsequent and different acts occasioning different results. It is a 'separate and independent claim' within the bounds of Sec. 1441(c) and as such permits removal to federal jurisdiction. The trial court properly granted the petitions of Great Western Drilling Company and Great Western Producers, Inc. for removal from the Oklahoma State Court.
 
 
 7
 Appellants attack the merit disposition of the cause by the trial court upon numerous grounds each one of which requires an interpretation and understanding of the terms and background of the gas purchase contracts entered into by the lessee defendants and the plant operators. These contracts are identical[2] as to both form and substance, varying only as to descriptive lands. The agreements commit the lessee defendants to sell the Ringwood gas to the plant operators at a price[3] which plaintiff argues has caused the lessee defendants to breach their commitments to him and which neither reflects actual nor market value of the gas; and appellants are further aggrieved by the trial court's holding that the contracts include all gas produced in the Ringwood Field, are not confiscatory in nature and do not violate the rule against perpetuities.
 
 
 8
 The Ringwood Field produces both oil and gas from two zones, the Manning and the Cherokee. The Manning zone was first discovered in 1945 and 233 wells are still producing oil and casinghead gas from that zone. Prior to 1951, the date of the gas purchase contracts here in dispute, the wells were operated by the lessee defendants whose operating facilities saved only the oil produced. Vast quantities of casinghead gas produced simultaneously with the oil were wasted by venting into the air. The conservation problem so created was considered by the Oklahoma Corporation Commission and the possibility of authoritative capping of the wells was brought to the attention of those operating in the field. Faced with the possibility of a complete shutdown if the venting of casinghead gas continued the producers made an extensive survey of potential market outlets. Approaches were made to Phillips Petroleum, Stearns-Rogers, Skelley, Sinclair, Continental and other companies capable of making the financial outlay necessary to gather and market the gas. None considered the investment economically sound, including Warren Petroleum Co. whose engineering survey was unfavorable as to the construction of both compression and extraction facilities. However, in late 1950, Oklahoma Natural, a public utility, agreed to construct the gathering and compression facilities upon the terms ultimately included in the gas purchase contracts. Similarly, Warren agreed to construct and operate the gasoline extraction facilities. On January 17, 1951, Superior Oil and Mazda Oil entered into the gas purchase contracts with Warren and Oklahoma Natural and subsequently all other producers in the field executed identical agreements. After construction of the plants at a total cost of $5,500,000, Great Western, in 1953, contracted for the sale of its gas at a similar price but expressly limited to production from the Manning zone.
 
 
 9
 From the evidence supporting this background of events the trial court specifically found that the lessee defendants acted in good faith and used due diligence in marketing the Ringwood gas. We are in simple accord with that finding for good faith must be explored by consideration of the circumstances then existing and it seems apparent that the lesses could not obtain more favorable terms. No other market was available.
 
 
 10
 After the execution of the gas purchase contracts, Warren Petroleum Corporation and Oklahoma Natural Gas Company, the purchasers under those contracts, sent instruments entitled 'Stipulation of Interest' to all of the royalty owners in the field. The documents amounted to certification of legal title and authorization for payment on the royalty interest in accordance with the terms of the gas purchase contracts. A substantial number of royalty owners executed the stipulation but others, including the plaintiff Greenshields, refused to sign.
 
 
 11
 Greenshields now maintains that inasmuch as he has not signed the 'Stipulation of Interest' form, there has been no transfer of title to the gas and that, therefore, the purchasers have converted the gas upon appropriation at the mouth of the well. It is true that oil and gas in natural state is not susceptible of ownership in place apart from the land in which it is found, but is personal property when reduced to possession. Whether or not title passes upon the occurrence of production must be determined from the language of the lease, Replogle v. Indian Territory Illuminating Oil Co.,193 Okl. 361, 143 P.2d 1002. In the Producers 88 lease here under consideration, it is provided that the lessor shall receive a portion of the gross proceeds at market rate of all gas, contrasting with the provision for his receipt of one-eighth part of all oil produced. It is well settled that the provision concerning the payment for gas operates to divest the lessor of his right to obtain title in himself by reduction to possession and that thereafter his claim must be based upon the contract with the one to whom he has granted that right. His claim can only be for a payment in money and not for the product itself. Mussellem v. Magnolia Petroleum Co., 107 Okl. 183, 231 P. 526; American Oil & Refining Co. v. Cornish, 173 Okl. 470, 49 P.2d 81; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194. The transfer from the lessors was as contemplated by their leases and effectively passed title to the lessees.
 
 
 12
 Subsequent to the erection of the processing plant, commercial production from the Cherokee sand lying above the Manning zone was begun. The gas from the Cherokee zone contains distillate and is not produced with oil as is the casinghead gas from the Manning zone. It is different from that produced in the Manning zone in that its gathering would not ordinarily require the low pressure system necessary to channel Manning zone gas into the residue pipe line. However, both gases require the reduction of liquifiable hydrocarbons before they can be introduced into the pipe line, and the trial court found that there are not sufficient daily volumes of Cherokee zone gas to maintain sustained pressure economically justifying the construction of a separate high pressure gathering system. Some wells were dually completed to produce from both zones without commingling the two substances; other wells, originally Manning wells, were later expanded to produce from the Cherokee zone. With the exception of Cherokee gas produced by Great Western Producers, Inc., specifically excluded in its contract with the purchasers, the purchasers claim the right to all gas produced in the Ringwood Field under their contracts of purchase with the producers and the trial court has upheld their contention. Although no recovery of Cherokee gas was being made at the time of the execution of the gas purchase agreements, the granting clause in those agreements provides: '* * * the seller hereby grants, bargains and sells and agrees to deliver to buyer and buyer agrees to purchase and take from seller * * * all gas now or hereafter produced from the wells on the lands * * *'. The lack of ambiguity in this provision, fortified by evidence that the existence of gas in the Cherokee zone was commonly known, leads us to reject, as did the trial court, the contention of appellants that the gas purchase agreements do not include sale of Cherokee gas.
 
 
 13
 Appellants next contend that the price provisions in the gas purchase contracts are such as to cause lessees to breach their lease commitments to market the gas at the prevailing rate and that the agreement has resulted in economic frustration for the royalty owners. It is true that the operation of the field has been disappointing to all concerned and that exhaustion of the field may occur without the royalty owners receiving the financial returns naturally relished. Reserves originally estimated at 180 billion cubic feet are now thought to have been less than 110 billion cubic feet. Although gas produced elsewhere is being purchased at a higher rate the trial court properly found that Cherokee gas, like Manning, could not be properly related to gas produced in other fields.
 
 
 14
 A comparison between gas taken from the Dover field near Ringwood and the Ringwood field gas demonstrates the factors which must be considered by a gas purchaser. Oklahoma Natural Gas Company buys the Dover gas at 10cents per MCF, but it is gas which has sufficient pressure to enter the pipe line from the well. Oklahoma Natural Gas Company there maintains gathering facilities costing $55,000; the Ringwood facilities required an investment of approximately $3,500,000. Its operating costs at Dover are $3,000 per year; whereas, at Ringwood the expenditure is $170,000 per year. An official of Oklahoma Natural Gas Company estimated that the gas from ringwood costs his company 12cents per MCF, considering that field's anticipated reserves. The two fields produce approximately the same volume per day.
 
 
 15
 In the Producers 88 lease, the lessee promises to pay to the lessor 'for gas from each well where gas only is found, the equal one-eighth of the gross proceeds at prevailing market rate' and to pay the lessor 'for gas produced from any oil well * * * one-eighth of the proceeds, at the mouth of the well, at the prevailing market rate * * *'. Therefore, the duty of the various lessees here involved was to use reasonable diligence to procure for their lessors the prevailing market rate, and under the circumstances, we cannot say that the trial court was clearly wrong in its determination that they had discharged this duty so as to compel a reversal on its findings relevant to market value. Chisholm v. House, 10 Cir., 183 F.2d 698. The trial court found:
 
 
 16
 '8. Oklahoma Natural Gas Company pays 10cents per MCF for 'pipeline gas' in 98% of its purchases in other areas of the State of Oklahoma. 'Pipeline gas' is gas which has sufficient pressure to enter the high pressure lines of Oklahoma Natural Gas Company for distribution to its customers through the State without further compression and is sufficiently dry so that the liquid hydrocarbons therefrom will not drop out in the transmission lines. The Manning gas and the Cherokee gas in the Ringwood Field are not 'pipeline gas.'
 
 
 17
 '9. The gas for which Oklahoma Natural Gas Company pays ten cents per MCF in other areas of the State is different in grade, quantity and quality, and in cost of transportation from market, than the Manning and Cherokee gas involved in this case. There is no evidence that after making due allowance for such difference, the prices paid by Oklahoma Natural Gas Company and Warren Petroleum Corporation for the gas involved in this case were less than the prices paid by either of said companies elsewhere in the state.
 
 
 18
 '14. The requirement of the gas purchase contracts for a dedication of all gas reserves for the life of the oil and gas leases lying within Townships 21 and 22 North and Ranges 10 and 11 West, was reasonable and necessary in order to induce the gas purchasers to make the investments necessary to gather, process and compress the gas and pay the expenses of operating those facilities.'
 
 
 19
 Cross claimant Livingston protests that under the gas purchase contracts, Oklahoma Natural Gas Company is receiving the residue gas from the gasoline refinery operated by Warren Petroleum Corporation without making any payment whatsoever to the lessees and royalty owners. This contention in based upon the payment provision of those contracts for '33 1/3 of the weighted average net value of all liquid products contained in the gas delivered by Buyer and saved and sold by the plant * * *'. Such contention is clearly without merit. It is fundamental contract law that a single consideration may support as many promises as are bargained for and given in exchange, Restatement of the Law of Contracts, sec. 83. The gas purchase contract determined a price to be paid upon the delivery of all the gas and even though that price was to be determined with reference to the liquid content, the sale of the gas residue after extraction of the liquid was clearly contemplated.
 
 
 20
 Under the gas purchase contracts entered by the lessees and purchasers, certain provisions were made for the retirement of the huge expenditures made by the purchasers in the determination of the rate of pay-out to the lessees and royalty owners. Greenshields apparently contends that the contract is thus beyond the power of the lessees to execute because they were granted entry on the land 'for the sole and only purpose of mining and operating for oil and gas' and that they have indirectly subjected the property to costs of construction. This argument neglects the whole duty of the lessees to protect their lessors' interests by preventing a shutdown of the oil wells by obtaining, if possible, a market for the gas at the best possible price. The mere fact that, due to the quality of the gas and the necessity for obtaining an immediate market for gas then being wasted, the purchasers were in an excellent position to bargain for a low purchase price cannot create a situation where the lessees would be liable to suit by the lessors whether they entered the only available contract or refused to enter it, provided they used diligence in promoting the lessors' interests. See Replogle v. Indian Territory Illuminating Oil Co., supra.
 
 
 21
 Having concluded that the trial court's finding that the lessors marketed the gas from the Ringwood Field at the prevailing market rate in accordance with their agreement to do so under their leases was justified by substantial evidence, we must reject Livingston's arguments anent the gas purchase contracts' effect as an inducement to breach the lease agreements.
 
 
 22
 Livingston next contends that the contracts should be avoided on the basis of Oklahoma constitutional and statutory anti-monopoly provisions.[4] In support of this view, he again cites the evidence of prices paid in other fields considered and rejected as not controlling upon the market price of gas in the Ringwood Field. The statements in the record that quality of gas, the size of the gas reserves, and the cost of gathering are not considerations as to prices paid for gas in the field are referenced to particular situations, all of which arise from comparative purchases of pipe line gas meeting the minimum standards for purchase and do not include gas similar to that being extracted from the Ringwood Field. The trial court concluded on this issue:
 
 
 23
 'There is no evidence that after making due allowance for such differences (grade, quantity, and quality and cost of transportation) the prices paid by Oklahoma Natural Gas Company and Warren Petroleum Corporation, for the gas involved in this case, were less than the prices paid by either of said companies elsewhere in the State.'
 
 
 24
 There is substantial evidence to support the trial court's finding that considering the type of gas involved the royalty owners and producers were receiving for their interests a prevailing market rate and that the Ringwood gas is not comparable to pipe line gas in other fields; therefore, there is no showing of discrimination.
 
 
 25
 Finally, appellant Livingston contends that the option provision[5] contained in the gas purchase contract violates the Oklahoma statutory prohibition against perpetuities as contained in 60 Okla. Stat.Ann. 175.47 which states 'The absolute power of alienation of real and personal property, or either of them, shall not be suspended by any limitations or conditions whatever for a longer period than during the continuance of a life or lives of the beneficiaries in being at the creation of the estate and twenty-one years thereafter * * *.'
 
 
 26
 As we have earlier indicated, oil and gas is not subject to strict ownership in its natural state under Oklahoma law. As a consequence, the Oklahoma statutory expansion of the rule against perpetuities to include personal property is not violated by the instant grant of option where no present transfer of title is possible. And similarly, the option as far as it pertains to interests 'hereafter acquired by seller' is not within the scope of the statute or rule. But the owner of land does have the exclusive right to explore for gas and oil and to acquire absolute title to it. This right is the proper subject of sale and the acquired or reserved right to oil and gas is recognized as an incorporeal hereditament-- a profit a prendre, Rich v. Doneghey, 71 Okl. 204, 177 P. 86. Where, as here, the owner of an oil and gas lease contracts for the sale of oil and gas from the wells thereon, giving the vendee the right to go upon the land and place the necessary structures to connect the well with its pipe line an interest in the leasehold is thus granted. Southwest Pipe Line Co. v. Empire Natural Gas Co., 8 Cir., 33 F.2d 248, 64 A.L.R. 1229; Graham v. Omar Gasolene Co., Tex.Civ.App., 253 S.W. 896. And if the enjoyment of that interest, vesting by option[6] or otherwise, is postponed beyond the allowable period a violation of the statute and rule is apparent. But the progressive utilization of an interest fully vested in the first instance does not create a perpetuity even though the use of the land is restricted for a period of unlimited duration. Restatement of the Law of Property, Sec. 399, p. 2341. We believe this rule to be particularly applicable to oil and gas for though the rule against perpetuities is a strict rule it is yet practical and should not be construed to impede the development of resources in this natural field. Since the interest granted to the plant operators immediately vested and the option provision gives only the right to a progressive utilization of the possessory enjoyment there is no violation of the Oklahoma statute.
 
 
 27
 Other points urged by appellants have been considered and deemed by us to be without merit. The judgment is affirmed.
 
 
 
 [1]
 The complaint contains thirty-one lengthy paragraphs and covers thirty-four pages on the record transcript. To set it forth verbatim would be most burdensome to our decision. Counsel for appellants and appellees have attempted to summarize the allegations and in so doing have in effect begged the question for each such summary supports their respective conclusions, that is that the complaint sounds in tort or contract as their positions require. We set forth only those assertions of the pleader which we believe determinative of the issue
 
 
 [2]
 Excepting those entered by the Great Western Companies. We will but occasionally note the exception hereafter
 
 
 [3]
 The price is based on a weighted average net value of all liquid products contained in the gas, amounting in the past to about 1 1/2cents to 2 1/2cents per MCF
 
 
 [4]
 Oklahoma Constitution, Article 9, Section 45
 
 
 [79]
 Okla.Stat.Ann. 2: 'It shall be unlawful for any person, firm, corporation orr association, engaged in the production, manufacture, distribution, purchase or sale, of any commodity of general use, or rendering any service to the public or engaged in the sale or furnishing of advertising or advertising service or space for advertisements in publications thereof, to directly or indirectly, either in person or by or through any agent or representative, discriminate between different persons, firms, associations or corporations, or between different sections, communities or cities of the state;
 '(C) By buying such commodity at a higher price in one section, community or city than another, after making due allowance for the difference, if any, in the grade, quantity or quality of the commodity and in the actual cost of its transportation from the point of purchase to the point where such commodity is to be sold by the purchaser, or to be consumed, or to be used in the manufacture of commodities or products, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition of any person who, in wood faith, intends or attempts to become such dealer;
 '(D) By buying such commodity in any section, community, or city of the state at a higher price from one person, firm, corporation or association than from another, after making due allowance for the difference, if any, in the grade, quantity or quality of such commodity, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition or restraining trade, or to destroy the competition of any regular established dealer in such commodity or to prevent the competition of any person who, in good faith, intends and atempts to become such a dealer.'
 
 
 [5]
 The pertinent part of the option clause reads as follows:
 '* * * the Seller hereby grants, bargains, sells and agrees to deliver to Buyer and Buyer agrees to purchase and take from Seller, subject to the stipulations and conditions hereinafter specified, all the gas now or hereafter produced from the wells on the lands described in Exhibit 'A' hereto, and also, at Buyer's sole and continuing and recurring option all the gas now or which may hereafter be produced or which may be hereafter acquired by Seller other than those described in Exhibit 'A' and lying within Townships 21 and 22 North and Ranges 10 and 11 West, Major County, Oklahoma.'
 
 
 [6]
 Morgan v. Griffith Realty Co., 10 Cir., 192 F.2d 597