**NORDAN–LAWTON OIL AND GAS CORPORATION OF TEXAS**

v.

**Preston J. MILLER et al.**

**Civ. A. No. 11091.**

United States District Court
W. D. Louisiana,
Lafayette Division.

Aug. 22, 1967.

Frank M. Lamson, Port Arthur, Tex., Camp, Carmouche, Palmer, Carwile, Babin & Barsh, Lake Charles, La., John A. Bivins, Lafayette, La., for plaintiff.

James Domengeaux, Domengeaux & Wright, Lafayette, La., for defendants.

## OPINION ON THE MERITS OF THE CASE

BEN C. DAWKINS, Jr., Chief Judge.

Pursuant to the provisions of 28 U.S. C. § 2201, petitioner [1] filed this action praying that this court declare the rights and other legal relations existing between petitioner and respondents [2] under a mineral lease executed by the parties. Respondents filed a counterclaim seeking a judicial cancellation of the lease, payment of "lieu royalties," an accounting for all monies derived by the lessee since the date of the alleged termination, plus all of the equipment on the leased premises and attorney fees in the amount of $25,000.

Jurisdiction of this court rests upon 28 U.S.C. § 1332, diversity of citizenship, and involves the requisite amount in

---

1. Petitioner in this case also includes William T. Burton and William T. Burton Industries, Inc., who were joined as additional parties.

2. Respondents include Preston J. Miller, Preston J. Miller, Jr., Lottie Lucia Miller and Beverly Marie Miller Summers, owners of the property involved in this litigation.

controversy. For the most part, the facts which give rise to this litigation are stipulated by the parties and are hereinafter set forth.

On May 7, 1958, the parties litigant entered into a contract entitled "SHOOTING PRIVILEGE AND OPTION FOR OIL, GAS AND MINERAL LEASE" which entitled petitioner to explore, investigate and prospect, but *not* to mine, drill or produce certain described lands owned by respondents. Petitioner paid a cash sum of $32,000 for this exploration privilege which was effective until January 6, 1959. To gain the added privilege of drilling, producing and mining any minerals which might be discovered, petitioner was to pay respondent the cash sum of one million dollars ($1,000,000) on or before January 6, 1959. This was done on December 11, 1958, when the parties slightly amended their original contract and acknowledged payment of the cash bonus. Thus the rights and obligations of the parties as lessor and lessee were established by the terms of the lease contract.[2a]

█ Among other things, the Miller lease provides that the lands subject to the agreement cover some 4870 acres and the 'Primary Term' was fixed at 3 years, and as long thereafter as oil, gas and/or other mineral is being produced or operations conducted subject to the terms of the contract.[3] Clauses 7 and 8 of the contract fix the royalty to be paid for oil and gas at $\frac{1}{8}$ of all produced, while clauses 9 through 11 provide for special situations involving royalties. Clause 8, the gas royalty provision, constitutes the heart of this dispute and will be discussed in greater detail later. Briefly, in addition to providing for a production royalty of $\frac{1}{8}$, clause 8 also

provides for the payment of "lieu royalties" when a "market cannot be secured for gas from a well or wells producing gas only. * * *" The amount to be paid in the event lieu or shut-in royalty payments are due is governed by clause 13. Additional clauses of the lease provide for: an orderly and full development of the property;[4] the drilling of offset wells to prevent drainage;[5] the release of any acreage which lessee does not wish to develop;[6] operations in a careful manner to prevent injury to the surface or interference with the landowner's enjoyment of the property;[7] and the right of removal of equipment in the event of termination.[8] Other provisions pertinent to disposition of this case will be discussed in the course of this opinion.

Under the contract the lessee was obliged to commence drilling on or before January 6, 1960.[9] In addition, if during the Primary Term, lessee drilled a dry hole or in the event of discovery of oil or gas, production should cease, lessee bound himself to commence additional drilling or reworking operations within 60 days from cessation of operations or production.[10] Should there be continuous production, lessee covenanted to drill additional wells each 6 months until a full development of the property had been accomplished.[11] Pursuant to these terms, between January 8, 1959, and February 26, 1965, the following events took place and will be discussed in chronological order.

On January 8, 1959, the initial well, Miller No. 1, was spudded and on June 8, 1959, completed as a producer. September 22, 1959, Miller No. 2 was spudded but plugged as a dry hole in November. Well No. 1 was designated as a gas condensate well, and on November 20, 1959, the lessee-operator entered into

---

**2a.** This contract will hereafter be referred to as the lease or Miller lease.

**3.** Clause 5 of this lease, said clause commonly being known as the "Habendum Clause."

**4.** Clauses 12, 14, 15, 16 of the lease.

**5.** Clause 17 of the lease.

**6.** Clause 13

**7.** Clause 24

**8.** Clause 2.

**9.** Clause 14.

**10.** Clause 14.

**11.** Clause 16.

a Gas Purchase Contract with Trunkline Gas Company. In this contract the lessee "dedicated" [12] *all* the reserves under the Miller lease to the pipeline company which in essence means that the company was given exclusive rights to purchase the reserves under the premises when and if produced.[13] The company agreed to purchase the production at a rate equal to an average of one thousand (1000) MCF per day for each eight million (8,000,000) MCF of determined gas reserves.[14] A separate clause of the agreement provided for a redetermination of the reserves by either party.[15] The price to be paid for the gas was twenty-two cents (22¢) per one thousand cubic feet of gas with provision for escalation of price over a period of years.[16]

On April 16, 1960, Miller No. 3 was spudded and completed as a producer. Miller No. 4 was spudded February 27, 1961, and was later abandoned as a dry hole. As of April 1, 1962, Miller No. 5 had been completed as a producer. Miller No. 6 was spudded September 29, 1962, and plugged and abandoned as a dry hole on November 4, 1962. May 15, 1963, Miller No. 7 was drilled and thereafter completed as a producer. Two additional wells, Miller No. 8 and Miller No. 9, were also drilled, but both turned out to be incapable of production. Thus drilling operations were concluded by lessee on the Miller lease on February 26, 1965. In terms of cost these operations comprised: 1) Lease cost (bonus, etc.) $1,333,118.50; 2) Geophysical costs $41,440.29; 3) Wells drilled on the Miller lease $2,828,681.51. Total: $4,203,-440.30.

It is not disputed that the lessee-operator has timely paid all royalties due lessor-landowner derived from wells designated Miller No. 1 and Miller No. 3. Furthermore, there is no contention that any delay rentals were ever due under the terms of the lease, or that operator failed to discharge his obligation to drill offset wells. However, on May 4, 1965, lessor, through counsel, demanded cancellation of the lease in question on the grounds that the lessee had failed to: (1) timely pay "lieu royalties" pursuant to Clauses 8 and 13 of the lease; (2) carry out the provisions of Article 14, which relate to the obligation to drill additional wells in the event of cessation of production or the drilling of a dry hole; (3) produce from Miller No. 1 a ratable take as required by Clause 13, that well being in a common reservoir. This demand by lessor precipitated the instant complaint which was filed by lessee May 17, 1965. The pleadings filed before this court, including the pre-trial stipulations and orders, have placed the litigants in positions hereinafter set forth.

*Lessor-Landowner.* The main basis for cancellation prayed for by the landowners is contained in the lease itself in Clauses 5 and 8 which, as amended, provide:

> "5. *Subject to other provisions herein contained,* this lease shall re-

12. Williams and Meyers, Oil and Gas Terms (1957), p. 54:
"Dedication of reserves. The assurance of an adequate supply of natural gas to a pipeline company, usually accomplished by a Gas Purchase contract between a natural gas producer and the pipeline company. A typical contract will provide that 'seller hereby dedicates to the performance of this contract all gas located in, under, or hereafter produced from the units, leases, and lands described. * * *' Such contracts normally run for a period of at least twenty years. Dedication of reserves is required by the Federal Power Commission acting under the Natural Gas Act, 52 Stat. 821,

15 U.S.C. § 717 et seq., which requires the issuance of a certificate of public convenience and necessity by the Commission as the prerequisite of constructing and operating an interstate gas pipe line. Issuance of the certificate depends upon a showing, *inter alia* of an ability to provide adequate, continuous and reasonable service, which obviously includes an adequate gas supply."

13. See Gas Purchase Contract, Article V, p. 8.

14. Ibid., Article VIII, p. 18.

15. Ibid., Article VII(2), p. 16.

16. Ibid., Article VII, p. 29.

main in force for a term of three (3) years from and after January 6, 1959, called 'Primary Term', and as long thereafter as oil, gas and/or other mineral is being produced, or operations are being conducted by Lessee, as hereinafter provided.

\* \* \* \* \*

"8. One-sixth (⅙) of all gas at the well, including casinghead gas or other gaseous or hydrocarbon products produced and saved or utilized. Or Lessee shall, in lieu of said gas delivery, and at Lessor's option, pay to Lessor sums equal to the value thereof at the well, provided no gathering or other charges are made chargeable to Lessor; provided further that the price paid Lessor for said gas shall in no event be less than twenty (20¢) cents per one thousand cubic feet. It is further agreed that in the event the price of gas marketed from the above land should be fixed by order of the Federal Power Commission, which is less than the amount above specified, Lessee shall not be required to pay Lessor more than the maximum price allowed by said Federal Power Commission. *It is further agreed that Lessee, when a market cannot be secured for gas from a well or wells producing gas only, and such gas is not being utilized or sold on or off the premises, pay Lessor 'lieu royalty' at monthly intervals, in advance, commencing six (6) months after the date on which such well is completed as a producer of gas, a sum equal to one-twelfth (1/12) of the annual rentals due for the then current year, if it be within the primary term and if such payment is made or tendered, it will be considered that gas is being produced from the lease in paying quantities. \* \* \*"* (Emphasis added.)

Landowner alleges that the lease in question has terminated by its own terms because the petitioner had failed to pay "lieu royalties" from the wells designated Miller No. 5 and Miller No. 7. Specifically, respondent alleges that wells 5 and 7 are shut-in because, using the terms of the lease agreement, "a market cannot be secured for gas from a well or wells producing gas only \* \* \*," and therefore these royalty payments are due but have not been paid. It is undisputed that the two wells in question were in fact shut-in, that is to say, were not producing at the alleged times. The record clearly reflects, and lessee-operator admits, that well No. 5 was shut-in for a period of some 15 months, commencing around April 1, 1963, and ending May 30, 1964. Likewise, the evidence is clear that well No. 7 has been shut-in since its completion on September 15, 1963, and remained so until this action was instituted. What is *not* clear, and what forms the crux of this litigation, is *why* were these wells shut-in? Lessor-landowner *strongly* contends that these wells were shut-in for a lack of market, while lessee-operator asserts with equal force that the wells were shut-in for other legitimate operational reasons. Thus, lessor-landowner contends that because the lessee has failed to pay the "lieu royalties" allegedly due, the lease has terminated under the provisions of Clause 32 which states:

"32. Should Lessee fail to comply with the requirements hereof relating to the drilling of successive wells hereunder, or with reference to the drilling of offset wells or with reference to the payment of royalties (including 'lieu royalties'), all of Lessee's rights of every kind and nature whatsoever (except as to the acreage to be retained around wells as hereinabove provided) shall lapse, cease and end, and this lease shall automatically terminate as of the date of such default."

In answering the contention of the lessee-operator that the lease is maintained by the provisions of the Habendum Clause because of the continuous production

from wells 1 and 3, the landowner maintains that the obligation to pay "lieu royalty" exists regardless of whether there is production from some well or wells if in fact any well or wells are shut in for a lack of market. To reach this result the landowner points out that the Habendum Clause is prefaced with the qualifying phrase, "Subject to other provisions herein contained * * *," one of which is the obligation to pay "lieu royalty" under Clause 8. In this connection the landowner submits that the obligation to pay these royalties is "mandatory" as opposed to "permissive." [17]

Alternatively, the lessor avers that if this court finds that these wells were not shut in for a lack of market then the lease should be cancelled because the lessee breached the implied covenant to diligently market the production from the lease.

*Lessee-Operator.* The argument for maintenance of the lease and all rights and obligations thereunder on behalf of petitioner is a twofold proposition. First, lessee-operator contends that at no time during the operations was any well shut in because a market could not be secured. Lessee admits that wells 5 and 7 were capable of producing, but alleges that the wells were not put on production because of economical and operational reasons that were beneficial not only to the lessee but also to the landowners as well. Thus, it is alleged that additional information concerning the gas reserves was gained from wells 5 and 7 and that the evidence pointed to a smaller reserve supply than had originally been estimated. This being the case, a redetermination of reserves either by operator or Trunkline would have led to a reduced quantity being taken by Trunkline. This would have the effect of reducing payments to both the landowner and operator. In order to continue to produce at the current rate, the operator decided not to demonstrate the "weakness" of the additional wells and chance a reduced take by the gas company under the terms of the gas pipeline purchase agreement. As a corollary to this proposition, the operator contends that the provisions of this gas purchase contract are standard in the gas industry, especially the provisions pertaining to length of the contract and the "dedication" of all reserves under the lease. Petitioner's second argument has already been stated and is that the lease has been maintained by the Habendum Clause due to production from wells No. 1 and 3. In other words, lessee contends that any production from the lease in paying quantities will maintain it in force, the obligation to pay "lieu royalties" being necessary only when there is no production in paying quantities *and* a well or wells is shut-in for lack of market.

Able briefs and arguments of both counsel have presented this court with the following issues for determination:

(1) Does production from wells 1 and 3 maintain the lease under the Habendum Clause and dispense with the obligation to pay "lieu royalty" if wells 5 and 7 are found to be shut-in for a lack of market?

(2) Are wells designated Miller No. 5 and Miller No. 7 in fact shut-in for a lack of market?

(3) Has petitioner-operator operated and developed the lease as a prudent operator in all respects?

(4) Is this suit a proper one for cancellation of the lease?

*Is the Lease Maintained under the Habendum Clause?*

To determine this issue it is first necessary to resort to several well-established principles of law. It is indeed a well-founded principle that all contracts have the effect of law between the parties thereto (LSA–C.C. art. 1901). It defines their legal rights and obligations. It must be construed as a whole, and so far as possible, effect must be

17. Morris v. First National Bank of Mission, 249 S.W.2d 269 (Tex.Civ.App.1952); 11 Baylor L.Rev. 19, 57; 27 Tulane L. Rev. 478, 482.

given to all of its provisions.[18] If any ambiguity is found, it must be construed against the party who prepared the contract,[19] in this case the landowner. Because of their extreme importance on this particular issue, certain clauses of the lease quoted previously are again delineated in part:

"5. Subject to the other provisions herein contained this lease shall remain in force for a term of three (3) years from and after January 6, 1959, called 'Primary Term', and as long thereafter as oil, gas and/or other mineral is being produced, or operations are being conducted by Lessee, as hereinafter provided." (Habendum Clause)

Clause 8 reads in part:

"8. * * * It is further agreed that Lessee, when a market cannot be secured for gas from a well or wells producing gas only, and such gas is not being utilized or sold on or off the premises, pay Lessor 'lieu royalty' at monthly intervals * * *."

In support of their respective contentions, counsel for both parties have quoted at length from a very lucid article by Mr. Leslie Moses (23 Tul.L.Rev. 374), concerning the purpose behind the advent of the "shut-in royalty clause." Suffice it to say that the full import of that article, and that of Wallace G. Malone in 11 Baylor L.Rev. 19, is that the "shut-in clause" was devised to benefit *both* lessor and lessee and that each such clause must be interpreted on an individual basis according to its own language. To be sure, the intended purpose of any oil and gas lease is the exploration for and the production of minerals in paying quantities so that both parties will reap the expected benefit from such operations. The shut-in royalty provision is a compromise clause when there is a well or wells capable of producing in paying quantities, but no market can be found for such produc-

tion. Under this type of clause the royalty owner is paid a stipulated sum while the production is shut-in, and the lease is maintained instead of being cancelled for lack of production. This brings the court to the clause contained in the lease in question (supra).

After a careful analysis of the lease, the court concludes that the Habendum Clause is "Subject to the other provisions * * *" of the lease, one of which is the provision containing the obligation to pay "lieu royalty" in the event that a well or wells are shut-in *because a market cannot be secured*. The lease is clear and unambiguous in this respect, and coupled with the purpose of such a shut-in clause, the court reaches this conclusion. The court also concurs with landowner's contention that the obligation to pay "lieu royalty" is *mandatory* as opposed to *permissive* unless there is some specific expression to the contrary. Such an expression is not found in the Miller lease. Having resolved this issue in favor of the landowner, the court now takes up the true bone of contention in this conflict, whether the wells were shut-in because a market could not be secured. Simultaneously we shall consider pragmatically the issue concerning prudent operation and development of the lease.

*Are Wells 5 and 7 Shut-in for a Lack of Market?*

*Has Petitioner Operated and Developed the Lease as a Prudent Operator in All Respects?*

Crucial to this issue is a finding of what constitutes a "market" for discovered gas. Very little help can be gained from an analysis of the lease in question, because the finding involved is one of *fact* not set forth in the lease itself. After an exhaustive search for authority, the court has found that there is indeed little, if any, authoritative statement of a general nature on this

18. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649; Delatte v. Woods, 232 La. 341, 94 So.2d 281; United Carbon Co. v. Interstate Natural Gas Co., 176 La. 929, 147 So. 37.

19. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649; Lawson v. Martin Timber Co., 238 La. 467, 115 So.2d 821; Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075.

particular point. Judging from the absence of written authority in counsels' briefs on the same matter, similar difficulty was apparently encountered by them. The matter is virtually *res nova*. Briefly stated, the general rule in cases of this nature is that each case must stand on its own facts. Thus, reference to the testimony given at trial is an important determinant on this issue. Similarly, a careful examination of the pertinent portions of the Gas Purchase Contract with Trunkline is necessary. Finally, but by no means least, an examination and analysis of the standard practices and procedures in the operation and marketing of gas production becomes vital to disposition of this question.

*Lessee-Operator's Argument*

Advancing the proposition that wells #5 and #7 were not shut-in for a lack of market, petitioner first introduced the testimony of Grady Roper, an officer of the operator's company, and the field operator of the lease in question. After describing the actual drilling operations conducted upon the lease,[20] Mr. Roper testified at length concerning why the wells were shut-in and also the circumstances surrounding the negotiation of the gas contract.[21] In essence he testified that these wells were shut-in because of a lower rate of flow;[22] that with respect to well #7 there was a possibility that unitization with adjoining leases might be necessary, thus reducing the Miller's ultimate share of production;[23] that the information gained from drilling the additional wells led to the inescapable conclusion by the operator that the field was not as productive as initially thought;[24] a redetermination of reserves was not asked for as it would have reduced the take Trunkline was required to pay for under the Gas Purchase

Contract.[25] The most significant of the arguments advanced above is the uncontroverted testimony by the operator that on the basis of additional drilling information, the reserves under the lease were not as extensive as estimated initially. Two additional witnesses testified for the operator in the case whose testimony is relevant to this issue, Lawrence Wesson, supervisor of gas purchases for Trunkline, and J. J. Hindman, a consulting engineer from Baton Rouge. The main thrust of Wesson's testimony was that under the terms of this particular contract, Trunkline had bought and operator had sold *all* of the gas that could be produced from the lease.[26] He further testified that this long-term contract was standard in the gas industry,[27] and the long term was necessary to insure the granting of a certificate of public convenience and necessity required by the Federal Power Commission. Furthermore, he stated long-term contracts were required to insure the proper installation and erection of pipelines to carry the production.[28] In addition it was brought out that during this time Trunkline took more than was actually required under the terms of the contract.[29] On the all-important question of whether a present market for the gas existed, Wesson testified that three elements constituted a gas market, to-wit: a gas purchase contract, a certificate from the Federal Power Commission, and the facilities to carry the production.[30] In his opinion, all these elements were present in this case. Whether the Gas Company was obliged to take more than the original reserve estimate specified, and thus preclude taking more if greater reserves were found, was clarified on cross-examination when Mr. Wesson pointed out that under the terms of the Gas Purchase Contract Trunkline would have been obliged to

20. See Transcript, pp. 4–12.

21. See Transcript, pp. 13–101.

22. See Transcript, p. 30.

23. See Transcript, pp. 37–40.

24. See Transcript, pp. 23, 61, 62, 64, 81, 82.

25. See Transcript, pp. 61–62.

26. See Transcript, pp. 136, 139.

27. See Transcript, p. 113.

28. See Transcript, p. 107.

29. See Transcript, p. 121.

30. See Transcript, pp. 126–127.

increase the amount or *rate of take* had there been proof of an increased reserve estimate.[31] This testimony is substantiated by the contract itself.[32]

Witness Hindman reiterated that this gas purchase contract was standard in the industry and was also standard for this field in South Louisiana at the time. This was relative both to the length of the contract and its various provisions dealing with determination of reserves.[33] According to Mr. Hindman's testimony, again uncontroverted, this was the *most* favorable contract as to price.[34] Again the testimony was that the wells were not shut-in for a lack of market[35] and also that the operation of the wells in question was within the discretion of the operator, that is to say, the pipeline company could not dictate which wells were to be produced at any time.[36]

*Lessor-Owner's Case for Cancellation*

In its case for cancellation based upon the failure to pay "lieu royalties," lessor called Mr. Eugene Cortinas who established through "Deliverability Tests" that the wells designated Miller Nos. 1, 3, 5, and 7 were in fact capable of producing in paying quantities. Because

there is no dispute regarding the payments relative to wells 1 and 3, this testimony is more pertinent to the capability of wells 5 and 7.[37] This testimony is uncontroverted as well as the evidence relative to the length of the shut-in period. While the testimony of the witness was obviously very well documented, it did not touch the question of reserves of the various wells nor did it deal with the existence of or lack of a market for the gas production. Thus, respondent called Mr. Paul Montgomery, an expert in petroleum engineering and gas and gas marketing. His testimony concerning the gas purchase contract was "It has standard qualifications and specifications as to gas quality, gas measurement and most of the basic components of the contract are pretty much standard for the industry."[38] On the other hand, he testified that during the period the wells were shut-in no market for the gas related to wells No. 5 and No. 7 existed because market was defined as "something that is happening currently."[39] Further describing the contract in question, Mr. Montgomery stated "it [the gas contract] probably, from the standpoint of price, was the best contract that was available. * * *"

---

31. See Transcript, p. 142.

32. See Gas Purchase Contract Article VII (2), p. 16, concerning a redetermination of reserves and Article VIII(1), p. 18, concerning the amount Trunkline was required to purchase.

33. See Transcript, pp. 168–170.

34. See Transcript, pp. 170–171.

35. Transcript, pp. 182–183:
 "Q: You don't consider part of this production the contract provides for is future production?
 "A: This is the reason for entering into a contract with an interstate pipeline. This is the very basic concept of long distance pipelines. They cannot build their facilities and satisfy the bond holders and the Federal Power Commission and the ultimate consumer without a long term dedicated source of supply. So that when the producer agrees to commit his gas over this period of time, in this particular case 8,000 days, then all of the production except that used for further

development of the lease is marketed to the buyer. It is not sold until actually tender changes hands, but the market is there."

36. See Transcript, p. 185.

37. From the pleadings, the court assumes landowner has dropped his claim to royalties due from well No. 8. See also Transcript, p. 196:
 "Q: THE COURT: In other words you are claiming lieu royalties with respect to Well No. 5 and Well No. 7?
 "A: MR. DOMENGEAUX: Yes, sir.
 "Q: THE COURT: Separate lieu royalties to each one?
 "A: MR. BIENVENU: We base it on the simple proposition lieu royalties are due and owing and the very basis of this thing is the delay in production. It is in lieu of royalties which normally would have been paid had the wells been produced. We make no claim for Burton-Miller Wells 1 and 3."

38. See Transcript, p. 223.

39. See Transcript, p. 225.

"In retrospect, after the reserves have been totally developed and it develops instead of having reserves on the order of four times what they actually turned out to be, they end up considerably less and with a shorter term contract at even a lesser price it might be more desirable if it allowed them to produce more gas and more income on the current basis." [40]

This was the essence of the testimony at trial. Before stating its finding on this issue, we must take cognizance of the following well-established principles:

 It is well settled that the main consideration of a mineral lease is the development of the leased premises in the hope of finding production in paying quantities, and that the lessee must develop with reasonable diligence or give up the contract; further, that as to what constitutes development and reasonable diligence on the part of a lessee must conform to, and be governed by, what is expected of persons in the industry of ordinary prudence under similar circumstances and conditions, having due regard for the interest of both contracting parties.[41]

. In the early, but still viable, case of Brewster v. Lanyon Zinc Co., 140 F. 801, 813 (8th Cir. 1905), it was said:

" * * * The decisions have not been entirely harmonious, and well illustrate the difficulty of laying down any comprehensive rule in respect of a question which is so largely one of fact that it must be resolved in each case according to its particular circumstances. * * *

* * * * * *

" * * * The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir—whether such as to permit the drainage of a large area by each well—and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. * * "

Ever mindful that each case must rest on its own facts [42] and that in each case the lease is the law between the parties, we hold that Miller wells No. 5 and No. 7 were *not* shut-in for a lack of market in this case. There is more than ample evidence in the record to support this finding. Lessee-operator introduced nu-

---

40. See Transcript, pp. 226–227.

41. See Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26; Logan v. Tholl Oil Co., Inc., 189 La. 645, 180 So. 473; Pipes v. Payne, 156 La. 791, 101 So. 144; Lelong v. Richardson, 126 So.2d 819 (La.App. 2d Cir.) ; Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases, 2d ed., §§ 122–123; 2 Summers, Oil and Gas, § 414.

42. See Wier v. Grubb, 228 La. 254, 82 So. 2d 1, 7:

"Obviously, the determination of the question whether defendants have sufficiently developed the leased property, in compliance with the development clause contained in the sublease and its implied obligations, can be resolved only after a consideration of all the facts. We recognize the difficulty of laying down any comprehensive rule which so largely involves one of fact, and, therefore, the merits of each case must be determined according to its particular circumstances."

merous reasons why these wells were shut-in other than the lack of a market. One of the more significant reasons was that on the basis of additional information concerning reserves, the field was not as lucrative as originally thought, and therefore a redetermination of reserves might lead to a reduced take by the gas company and result in a reduction of royalty to the operator and the landowner. This contention is strengthened as it is admitted to by the landowner in the testimony of Mr. Montgomery, the landowner's witness.[43] There is no evidence that such was not the case. Next, the gas purchase contract involved in this case was unquestionably one of the most favorable ever negotiated in this area. This is agreed to by all parties. The price of 22¢ is unusually high and is presently under attack by the Federal Power Commission as being *too high*. This price is also above the 20¢ required by the contract which evidences the good faith of the operator in negotiating the contract with Trunkline because the price offered by other companies in the area was substantially less. The contract itself is one that is standard in the gas industry and the dedication of all the reserves in a long-term contract is also standard procedure. Again, this is admitted by all parties. The record is replete with testimony as to the necessity of these long-term contracts.[44] This testimony is substantiated by the recognized commentators in the oil and gas field, and is illustrated with vivid clarity by two definitions taken from Williams and Meyers, Oil and Gas Terms (1957), as follows:

"Gas purchase contract. A contract for the sale and purchase of gas entered into by the purchaser and the owners of interests in the gas produced. Contracts of this type are usually for a long term inasmuch as the purchaser must have a substantial guaranty of an available supply to justify its expenditures for the con-struction of gathering, treatment and pipeline facilities and because the Federal Power Commission requires dedication of large reserves before issuing a certificate of convenience and necessity to pipeline companies. * * *" (p. 107)

"Dedication of reserves. The assurance of an adequate supply of natural gas to a pipeline company, usually accomplished by a Gas Purchase contract between a natural gas producer and the pipeline company. A typical contract will provide that 'seller hereby dedicates to the performance of this contract all gas located in, under, or hereafter produced from the units, leases, and lands described * * *.' Such contracts normally run for a period of at least twenty years. Dedication of reserves is required by the Federal Power Commission acting under the Natural Gas Act, 52 Stat. 821, 15 U.S.C. § 717 et seq., which requires the issuance of a certificate of public convenience and necessity by the Commission as the prerequisite of constructing or operating an interstate gas pipe line. Issuance of the certificate depends upon a showing, *inter alia*, of an ability to provide adequate, continuous and reasonable service, which obviously includes an adequate gas supply." (p. 54)

It is therefore quite clear from these definitions and the testimony at trial that the contract unquestionably was executed with all due care required of a prudent operator.

■■■■■ It is equally clear that the term "market" as used in Clause 8 of the Miller lease is synonymous with the term "market" as customarily used in the oil and gas industry. From the evidence at trial, especially that of operator's witnesses Wesson and Hindman, we find that there was in fact a market for this gas and that the wells were not shut-in "because a market could not be secured for gas from a well or wells producing

43. Transcript, p. 226.

44. See Transcript, p. 115 et seq.

gas only. * * * " The fact that *all* gas under the lease was not produced at a rate which the landowner unilaterally decides is necessary does not prove a lack of market for the gas. There is nothing in the lease defining "market" or the rate of marketing of production from the premises. This being the case, it must be assumed that both parties intended that the operator market the gas in a manner most beneficial to both parties. To do this the operator would necessarily have to resort to the standard practices and procedures in this business to secure such a "market." [45] Under the facts of this particular case, this is exactly what the operator did. Reiterating, this type of contract involving production over a long term is the recognized and established manner of gas sales. Nothing in the lease contract requires a different standard to which the operator should be held. Thus, additional evidence is found for holding that a "market" was indeed secured through the negotiation of one of the most favorable gas contracts ever executed in this area. Respondent's argument that the market was a limited or future one is disposed of by the fact the Gas Purchase contract expressly provided for a redetermination of estimated reserves and if greater reserves were established, the gas company was bound to take more gas. Again reiterating for the sake of emphasis, both parties have been substantially in accord with all of operator's contentions concerning the reserves available and the character of the gas contract. In the absence of clear evidence that the lessee has violated his duty as a prudent operator in negotiating the Gas Purchase contract, or that there was in fact a *lack of market* as the term is customarily understood, this court must and does hold that the lessee has faithfully discharged all of his obligations under this lease contract pertaining to the payment of all royalties, "lieu and/or production" as the case may be.

The court recognizes counsel for landowner's argument that in long-term contracts such as this one, it might be possible for the operator to sell all the reserves under the lands and not contract to receive royalties or produce any gas until some time in the distant future. Or alternatively, the operator might negotiate a contract for the sale of all reserves which required the gas company to take only a small percentage of production, thus depriving the landowner of valuable royalty payments. While all of these hypothetical propositions are certainly possible, suffice it to say that none of them are present here or applicable to the case at bar. It is hard to imagine the reasons for such negotiations to begin with and in view of the redetermination clause of this gas contract, it is impossible to believe that the operator had any such course in mind in this case.

■■■ Bearing on the question of an existing market and more particularly on the operator's duty to seek a market for available production, we note the previously-quoted testimony of landowner's witness Montgomery on direct examination. In essence he testified, in hindsight, that now that all relevant data concerning the wells was gathered, it would have been better to have negotiated a shorter term contract at even a lesser price to produce more on a current basis.[46] While everyone, landowner and operator alike, could certainly agree with this conclusion, operators are not held to such an all-knowing standard that is only revealed by *ex post facto* judgments. Thus, the general rule in this regard applicable here is that whatever shortcomings in the lessee's conduct may be revealed by hindsight, a covenant is

---

45. LSA-C.C. art. 1964: "Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources."

LSA-C.C. art. 1966: "By the word usage mentioned in the preceding articles is meant that which is generally practiced in affairs of the same nature with that which forms the subject of the contract."

46. Transcript, pp. 226–227.

not breached if, under the circumstances, an ordinary prudent operator might have followed the same course.[47] Such a course has been followed here.

Somewhat in point with the instant case is Greenshields v. Warren Petroleum Corp., 248 F.2d 61 (10th Cir. 1957). In *Greenshields,* petitioner was a royalty owner and alleged a breach of contract by the operator because of the latter's failure to market the gas at the prevailing rate. The gas purchase contract in that case was similar to the one between the operator in this case and the Trunkline Gas Company and it provided for the sale of "all gas now or hereafter produced from the wells on the lands. * * *" Disposing of Greenshields' contention that this sale did not include part of the reserves under a certain zone, the court found that due to "The lack of ambiguity in this provision, fortified by evidence that the existence of gas in the Cherokee zone was commonly known, leads us to reject, as did the trial court, the contention of appellants that the gas purchase agreements do not include the sale of Cherokee gas." (248 F.2d 67, 68). Going further, the court remarked: "It is true that the operation of the field has been disappointing to all concerned and that exhaustion of the field may occur without the royalty owners receiving the financial returns naturally relished. Reserves originally estimated at 180 billion cubic feet are now thought to have been less than 110 billion cubic feet. * * * Therefore, the duty of the various lessees here involved was to use reasonable diligence to procure for their lessors the prevailing market rate, and under the circumstances, we cannot say that the trial court was clearly wrong in its determination that they had discharged this duty so as to compel a reversal on its finding relevant to market value." (Id., p. 68). While it is true that *Greenshields* involved the primary issue of market price as opposed to the existence of "market" *per se,* it is, from a legal standpoint, applicable in defining the duty placed on the operator, and from a factual standpoint in that the reserves were not as large as originally estimated. No cancellation was granted in *Greenshields* and none is warranted under the circumstances here. While the right to dissolve a lease is subject to judicial control, each case must rest on its own peculiar facts and be decided accordingly.[48] In complying with his obligations to the landowner in this case, the operator has shown: 1) that he fulfilled the development obligation by drilling some nine wells on the lease at a cost of nearly $3,000,000.00; 2) that he fulfilled the marketing obligation by securing what has been established to be one of the best gas purchase contracts as to price, said contract being standard in all other respects including the rate of marketing and length of contract; and, 3) that he has operated the lease as a prudent operator under similar circumstances would have done. Since there has been no failure to operate the wells in a prudent manner and with reasonable diligence, it follows that the landowners did not suffer any injury for which the petitioner is liable. The contract has been faithfully fulfilled in all respects. Accordingly, there will be judgment for plaintiff as prayed, and dismissing the counterclaim by defendants at their cost.

A proper decree should be presented.

47. See Williams and Meyers, Oil and Gas Law, § 856.3; See also note 41, supra.

48. Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906; Brewer v. Forest Gravel Co., 172 La. 828, 135 So. 372; Fontenot v. Sunray Mid-Continent Oil Co., 197 So.2d 715 (La.App. 3d Cir.).